UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Mark L Pereguoy | * | |
|     Plaintiff. | * | |
| v. | * | |
| State of Maryland, Carroll County, Maryland and Kenneth L. Tregoning, Carroll County Sheriff | * | CIVIL ACTION NO.: MJG02CV4165 |
| | * | |
|     Defendants. | * | |

**STATE DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

The State of Maryland and Sheriff Kenneth L. Tregoning, Sheriff of Carroll County, ("State defendants"), by J. JOSEPH CURRAN, JR., Attorney General of Maryland, and FRANK W. MANN, Assistant Attorney General, their attorneys, submits this memorandum in support of its Motion to Dismiss or, in the alternative, for Summary Judgment pursuant to F.R.Civ.P. 12(b)(6) and F.R.Civ.P 56, and states as follows:

**I.  BACKGROUND.**

On December 24, 2002, Plaintiff Mark L. Pereguoy ("Peregoy")[1] filed this one count complaint ("Comp."), alleging he suffered retaliation in violation of Title VII of the Civil Rights Act of 1964. Peregoy claims that, as a result of being interviewed in connection with a race discrimination complaint in November of 2000, the defendants retaliated against him by taking two separate actions which occurred approximately eleven and fourteen months after the interview. Specifically, Peregoy complains that his office was moved in October

---

[1] In Plaintiff's Complaint and subsequent pleadings, it appears his name has been misspelled.

of 2001, and that he was reassigned to work as Shift Commander of the Carroll County Detention Center in February of 2002. Comp. at ¶¶ 9-10. Peregoy claims, as a result of these actions, he was compelled to resign after working one day in his new capacity. Comp. at ¶¶10, 12.

On June 6, 2002, Peregoy filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). According to the EEOC investigator, Peregoy failed to cooperate with the investigator by not returning her phone calls. Nonetheless, the investigator concluded that (1) Peregoy "voluntarily resigned after being temporarily transferred to the position of second shift Security Commander," (2) that there was "no evidence to support [his] allegation that [his] employer's actions violated the statutes," and (3) that there was "little prospect that further investigation would result in a cause finding." The investigator's letter and findings are attached as Exhibit ("Ex.") 1; letter dated September 25, 2002, by Regina M. Davis, Investigator, EEOC. Peregoy was issued a "right to sue" letter on September 27, 2002.

## II.     STATEMENT OF UNDISPUTED FACTS.

### A.     Plaintiff's Employment History.

At the time of his sudden resignation, Captain Peregoy was a valued and trusted member of the Sheriff's Department. *See* Ex.5: Affidavit ("Aff.") of Sheriff Kenneth Tregoning. Peregoy was third in command of the Detention Center, reporting only to the Warden and to the Sheriff. His expansive duties encompassed training, internal investigations, and other special assignments relating to sensitive and confidential information. *Id.*

Peregoy was first employed by the Sheriff's Department as a Correctional Officer in July 1981. Upon completion of his probation, he became a Correctional Officer I. He was promoted from Correctional Officer I to the rank of Corporal effective June 30, 1983; from the rank of Corporal to Sergeant effective July 12, 1984; and from the rank of Sergeant to Second Lieutenant effective February 8, 1996.

In November of 1998, Defendant Tregoning was elected Sheriff of Carroll County and took office the following month. Peregoy was then promoted from the rank of Second Lieutenant to First Lieutenant effective April 1, 1999 and from First Lieutenant to Correction Officer VII effective July 1, 1999. On August 5, 1999, Sherif Tregoning appointed Defendant Hardinger to serve as Warden. Peregoy was then promoted from Correction Officer VII to Correction Officer VIII effective April 27, 2000 and re-classified to the rank of Captain effective April 27, 2000.

In many cases, Peregoy's promotions were achieved with only the minium time required being spent in each grade. This is true for his promotions from Second Lieutenant to First Lieutenant, and from First Lieutenant to Captain, both of which occurred while Defendant Tregoning was Sheriff. *Id.*

**B.     Interview with County Attorney Kimberly Millender.**

In October of 2000, Lt. Salvertore Brown, an African American deputy sheriff, filed a race discrimination complaint with the EEOC. Lt. Brown alleged that Warden Hardinger had harassed him because of his race, and specifically referred to an alleged racial slur made by the Warden during a private, closed door meeting on September 9, 1999. Though the EEOC found no evidence of discrimination, Lt. Brown filed a Title VII lawsuit against the

Warden and Sheriff which this Court dismissed by Order granting Summary Judgment to the Defendant Sheriff Tregoning on January 16, 2003.[2]

On or about the same time Lt. Brown filed his EEOC complaint, Sheriff Tregoning asked Carroll County Attorney Kimberly Millender to conduct an in-house investigation. As part of the investigation, Ms. Millender interviewed Captain Peregoy on November 6, 2000, who stated he had no first hand knowledge of the Warden's use of any racist term but rather learned of the incident through Lt. Brown. Peregoy also claims the Warden discussed the incident with him several months after Lt. Brown filed his complaint, in an attempt to explain to Captain Peregoy that Lt. Brown had taken the remark out of context. Ex. 4 (Peregoy Dep. Tr. 59:13 - 60:11); Ex. 6: Aff. of Kim Millender.

Peregoy also told Ms. Millender he was not aware of any racial problems at the detention center. Instead, he told Ms. Millender he believed Warden Hardinger was unhappy with Lt. Brown because of the way Lt. Brown treated inmates and his handling and supervision of officers on his shift. In this regard, Peregoy stated he disagreed with the Warden's new philosophy of handing inmates, presumably siding with Lt. Brown. Ex. 6: Millender Aff.

After conducting her investigation, Ms. Millender sent a memo to Sheriff Tregoning, in which she wrote the following:

---

[2] *See Salvertore Brown v. George Hardinger, et.al*, Civil Action No. MJG-01-2023, Summary Judgment granted January 16, 2003. Prior to the Order granting summary judgment, Warden Hardinger's Motion to Dismiss was granted. Also, during discovery in *Brown v. Hardinger*, Peregoy was named as a witness and deposed. Excepts from his deposition are included herein as Exhibit 4.

> Based upon my interview with Lt. Brown and other persons with pertinent information, and review of all documentation provided, it is my opinion that no racial harassment has occurred. Although, there was an incident in the Fall of 1999 involving a racially inappropriate comment by the Warden, there have been no similar incidents since. In regards to the other incidents complained of by Lt. Brown, I find no evidence that these were racially motivated; rather, it is my opinion that a difference of opinion as to correctional philosophy exists between the Warden and Lt. Brown.

Ex. 2 (Memorandum from Kim Millender to Sheriff Tregoning, dated November 27, 2000).

**C.     Office Relocation.**

In the fall of 2001, the Sheriff's Office expanded its central records unit. As a result, a number of offices had to be relocated, including Peregoy's. On October 9, 2001, Warden Hardinger called Peregoy to inform him of this change and allowed him to determine which offices he and his subordinates would occupy.

At this time of this relocation, Peregoy was utilizing Family Medical Leave. However, following a visit to his doctor, Peregoy came into the Sheriff's Office to discuss options for a new office and after meeting with the Warden and several of his subordinates, Peregoy decided to share an office with Lt. Brown, which placed him closer to his subordinate officers.

During this time, a number of other officers were also asked to move their offices to provide adequate space for Sheriff's Office employees. The Assistant Warden, Earl "Steve" Turvin, began to share an office with shift supervisors. The Detention Center's three Classification Officers gave up their private offices to share one office. Two offices near the visiting area were converted to temporary housing for female inmates. The Warden's Conference Room was converted into open work areas for two supervisors. The Supervisor and Transportation Unit Officers shared space in the Police Officers' Report Room adjacent

to the Central Booking Unit and the Substance Abuse Counselors gave up their private offices to accommodate two counselors per office, including the supervisor.

### D.     Plaintiff's Reassignment.

Effective February 1, 2002, Peregoy was temporarily transferred from Special Operations to Security Commander, Shift 2. Ex. 3. This was done to best meet the operational needs of the Sheriff's Department and to best utilize Peregoy's twenty years of correctional experience in the training of newly promoted supervisors and junior staff. Ex. 5: Tregoning Aff.  Peregoy received notice of the change two weeks earlier, during a briefing attended by several high ranking officials in the Sheriff's Office: Colonel and Chief Deputy Robert Keefer, Warden George Hardinger, and Major (Assistant Warden) Turvin. Ex. 4. (Peregoy Dep. Tr. 70:08-21). During that meeting, Peregoy was informed of his new duties and responsibilities.

Peregoy was told he would be working in the jail as a Shift Commander on the 3:00 - 11:30 shift. Ex. 4 (Peregoy Dep. Tr. 70:8-15). He was told his duties would be similar to those assumed by Major Turvin, but that he and Major Turvin would work different shifts. Ex. 4 (Peregoy Dep. Tr. 71:17-21). These duties included complete supervision of the jail, supervision of subordinate officers, managing the security operations of the detention center, and monitoring the safety and well being of staff, volunteers, visitors, and inmates. In the absence of the Warden and the Assistant Warden, the Shift Commander was also authorized to act as the Warden's designee. *See* Affidavits of Major (Assistant Warden) Earl Stephen Turvin (Ex. 7), Sheriff Kenneth Tregoning (Ex. 5); *see also* Ex. 4 (Peregoy Dep. Tr. 107:3-14).

At the time of the reassignment, Peregoy also knew he would continue to conduct internal affairs investigations and, at least temporarily, continue to perform "cultural diversity" training. Ex. 4 (Peregoy Dep. Tr. 79:06-18; 71:1-12). In fact, Peregoy's initial reaction to his new, *increased* responsibilities was to inquire about the possibility of receiving a promotion and pay raise. Ex. 4 (Peregoy Dep. Tr. 81:9-17).

Peregoy did not formally object to his new assignment and failed to take advantage of several opportunities to raise any concerns he may have had. On at least one occasion, the Sheriff announced, in front of Peregoy and several other officers, that he was "available" to discuss any of Peregoy's concerns about his new responsibilities. Ex. 4 (Peregoy Dep. Tr. 77:6-13). Peregoy never contacted the Sheriff or called to schedule a meeting. Likewise, on January 31, 2002, the Warden offered to meet with Peregoy, but Peregoy never scheduled a meeting or called the Warden. Instead, Peregoy worked one last day, took several days leave, and resigned without warning. Ex. 4 (Peregoy Dep. Tr. 77:19-78:13; 72:6-15).

In truth, Peregoy was upset with his new assignment because it apparently conflicted with his *personal* plans. Because his wife was attending school, Peregoy proposed to work only four days a week, from 2:00 p.m to 12:00 a.m. – on Friday, Saturday, Sunday, and Monday. Ex. 4 (Peregoy Dep. Tr. 73:13-74:7). This proposal was apparently "non-negotiable" from Peregoy's view insofar as he never proposed any alternate schedule. Ex. 4 (Peregoy Dep. Tr. 76:15-19). However, because of operational needs, including the need for an "Monday through Friday" evening Shift Commander, Peregoy's proposed was turned down. Ex. 5: Tregoning Aff.

Peregoy admits that, as a part of his employment, his schedule "can be changed any time." Ex. 4 (Peregoy Dep. Tr. 73:6-7). He also acknowledges that his new assignment did not prevent him from pursing his own educational plans. Ex. 4 (Peregoy Dep. Tr. 75:2-12). Rather, in vague terms, he testified only that the new assignment conflicted with "the way we had structured everything ... with the way that we set up us going to school and with the children and everything." Ex. 4 (Peregoy Dep. Tr. 75:7-12).

## III. ARGUMENT.

Because he suffered no adverse employment action prohibited by Title VII, Peregoy's Complaint has no merit. Peregoy can show no facts to show that his relocation and reassignment were adverse employment actions or that these actions made his working conditions intolerable. Moreover, even if the defendants' actions *could* be considered adverse, the complete lack of nexus between them and Peregoy's alleged participation in any protected activity on November 6, 2000, is equally fatal to his claim. Given the consistent line of cases considered by this Court and the Fourth Circuit, there has been too much time between the incidents to give rise to any inference of retaliation.

### A. No Adverse Employment Action was Taken Against the Plaintiff.

#### 1. Office relocation.

Peregoy states that in October of 2001, his "office space was taken away" by Sheriff Tregoning and Warden Hardinger. Apart from the fact that this statement is misleading insofar as Peregoy was provided new quarters, this is a not an adverse employment action protected by Title VII. *Spriggs v. Public Service Com'n of Maryland*, 197 F.Supp.2d 388, 392-93 (D.Md.2002), *citing Von Gunten v. Maryland,* 243 F.3d 858 (4th Cir.2001); *see also*

*Johnson v. Quin Rivers Agency for Community Action, Inc.*, 140 F.Supp.2d 657, 664 (E.D.Va.2001)(employee failed to establish that transfer to another office was adverse employment action where her title remained the same and she received no reduction in salary or benefits); *Murray v. City of Winston-Salem, N.C.*, 203 F.Supp.2d 493, 502 (M.D.N.C.2002) (relocating Plaintiff from a private office to a cubicle is not sufficient to constitute an adverse employment action).

At any rate, Peregoy was not even left without an office. When he testified under oath he stated that (1) other offices were available for his use, (2) other employees were willing to give him their offices, (3) other officers were willing to share their office space with him, and (3) the Warden was willing to relocate an officer so Peregoy could occupy that officer's quarters. Ultimately, Peregoy chose to share an office with. Lt. Brown. Ex. 4 (Peregoy Dep. Tr. 64:13-65:14). Thus, under no set of facts can he claim he was denied an office.

Even if Peregoy feels that having to share an office is an adverse employment action, and it is not, he took little if any steps to remedy the situation. In his deposition, Peregoy stated that there were three individuals with the authority to assign him to an office: the Warden, Colonel Keefer, and the Sheriff. Yet, Peregoy never spoke to either Colonel Keefer or the Sheriff about an office. Ex. 4 (Peregoy Dep. Tr.68:8-10; 69:20 - 70:1). And he admits the Warden *was* willing to provide him with an office by relocating a subordinate officer. Ex. 4 (Peregoy Dep. Tr. 68:19- 69:4).

    **2.**    **Reassignment.**

Peregoy claims he was removed from "his established position as Commander of Special Operations..., eliminated from command staff briefings" and "relegated to a position

of virtually no responsibility." Comp. at ¶¶ 9-10. Surprisingly, these *unsworn* allegations directly contradict his previous sworn statements. For instance, during his deposition, Peregoy admitted he had been (1) reassigned to work as a Shift Commander of the detention center (Ex. 4 (Peregoy Dep. Tr. 70:8-15)), (2) that his duties and responsibilities would be similar to the Assistant Warden (Major Turvin) (Ex. 4 (Peregoy Dep. Tr. 71:17-21)), (3) that he would continue to conduct internal affairs investigations, and, for the time being, (4) that he would continue to conduct "diversity" training (Ex. 4 (Peregoy Dep. Tr. 79:06-18; 71:1-12)). Thus, based on these statements alone, the claim that he was stripped of all responsibility is without merit.

"Actions that do not cause a change in salary, benefits, or responsibility generally are not considered adverse employment actions." A.C. Modjeska, Employment Discrimination Law § 1:04, at 13 (3d ed.1999). The Fourth Circuit holds that reassignment can only form the basis of a valid Title VII claim if the plaintiff can show it had some *significant* detrimental effect. *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir.1999) (absent decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment does not constituted an adverse employment action even if the new job causes some modest stress). Here, Peregoy cannot show that a job of equal or increased responsibility constitutes an adverse employment action. Moreover, any allegation that this constitute an intolerable working environment is totally speculative since Peregoy quit the day after his assignment took effect.[3]

---

[3] Strangley, Peregoy also appears to claim that, along with his new assignment,
(continued...)

At best, Peregoy can only show that the new assignment caused him stress because it interfered with his personal affairs. But Peregoy can present no evidence, and has pleaded no facts, to show that he was entitled to a four-day work week or that such a schedule was a benefit of employment or "part and parcel of the employment relationship." *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984). Hence, because Peregoy suffered no adverse employment action, his claim must fail.

Equally fatal to Peregoy's claim is the fact that he never worked more than one day in his new capacity. Therefore, he was in no position to make any determination as to what impact, in any, his new position would have. According to his own testimony, he worked only February 1, 2002, during which he merely boxed up his belongings in anticipation of resigning. Ex. 4 (Peregoy Dep. Tr. 72:6-15). He then took four more days of personal leave and resigned. *Id.*

The fact that Peregoy quit before he actually assumed his new duties belies his highly highly strained allegation that he was constructively discharged. The Fourth Circuit has held that the employee's election to resign or retire, and accept the benefits of resignation or retirement, is voluntary and operates to forfeit any cognizable interest the employee might have had in his continued employment, unless the employee can establish "constructive discharge" by showing the resignation or retirement was either (1) "obtained by the employer's misrepresentation or deception," or (2) "forced by the employer's duress or

---

[3] (...continued)
which began February 1, 2002, he was "eliminated from command staff briefings." On its face, this would appear impossible since Peregoy never worked beyond February 1, 2002. Comp. at ¶ 10.

coercion." *Zepp v. Rehrmann*, 79 F.3d 381, 386 (4th Cir. 1996)(citing *Stone v. University of Maryland Medical System Corp.*, 855 F.2d 167 (4th Cir. 1988)).  *See Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)(constructive discharge requires showing that working conditions were "intolerable").  *See also Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2000)(same).

Peregoy cannot show his decision to immediately resign resulted from either misrepresentation or deception, nor from any duress or coercion by the Sheriff.  He cannot plead any facts to show that, in his new position, his working conditions were intolerable since he spent his first day on the new job packing up belongings.

"An employee may assert a constructive discharge claim only by demonstrating that the employer deliberately made work conditions so intolerable that no reasonable person would have remained on the job." *Diamond v. T. Rowe Price Assoc., Inc.*, 852 F.Supp. 372, 397 (D.Md. 1994.)  "This rule serves the strong legislative policy in favor of the employees' remaining on the job while [the] claim is being investigated by the EEOC or litigated in the courts." *Id.*  Thus, an employee is not permitted to leave work simply because he alleges discrimination. *Id.*

When measuring tolerability of working conditions, courts must employ an objective standard.  Given that Peregoy's new assignment resulted in no change in pay, rank, job status, job title, or benefits, no find finder would conclude that his working conditions were suddenly made intolerable. *Matvia v. Bald Head Island Management, Inc.*, 259 F.3d 261, 272 (4th Cir.2001).  Peregoy's bald allegations are insufficient to defeat a motion to dismiss.  And the allegation that he was left with "virtually no responsibility" sharply contradicts his

statements under oath. Comp. at ¶ 10. In fact, even if Peregoy could prove the Sheriff and Warden reduced his job responsibilities an/or supervising authority, his claim would still fail insofar as such conditions would not be intolerable. *Jurgens v. EEOC*, 903 F.2d 386, 391-92 (5th Cir.1990) ("[A] slight decrease in pay coupled with some loss of supervisory responsibilities" is insufficient evidence of constructive discharge).

    **B.**    **Peregoy Cannot Show a Causal Connection Between His Interview in November, 2000 and the Actions Taken in October, 2001 and February, 2002.**

The Fourth Circuit has concluded that "a lengthy time lapse between the employer being aware of the claimant's protected activity and the alleged adverse action negates any inference that a causal connection existed." *Lewis v. Caldera*, 2001 WL 460753, * 16, *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998). For this reason alone, Peregoy's claim must fail. This Court previously concluded in *Vandevander v. St. Mary's County Sheriff's Office*, 2001 WL 5899989 (2001) that a five-month lapse between the Sheriff's knowledge of the plaintiff's protected activity and his decision to terminate the plaintiff's employment was too long to support of a finding of retaliation. *Id.* at *8. *See also Conner v. Schnuck Markets, Inc*. 121 F.3d 1390, 1395 (10th Cir.1997)(noting that four-month lag is not enough to justify an inference of causation).

In her November 28, 2000, memo to Sheriff Tregoning, Ms. Millender informed the Sheriff that she had concluded her interviews and review of all documentation on November 27, 2000. Ex. 6: Millender Aff. Assuming, *arguengo*, that Peregoy's "office" relocation constituted an adverse employment action, and it was not, the eleven month lag between it and Peregoy's interview with Ms. Millender negates any inference of retaliation. The same

holds true, to an even greater extent, with respect to the *fourteen* month lag between the interview and Peregoy's reassignment. Both of these time lags are more than twice as much as those cited by the Fourth Circuit in cases where the lack of temporal proximity was found to be fatal to the retaliation claim. *See also Parrott v. Cheney*, 748 F.Supp. 312 (D.Md.1989) (passage of five months between filing EEOC complaint and adverse action may be enough to negate causal connection)), *aff'd per curiam*, 914 F.2d 248 (4th Cir.1990); *Garrett v. Lugan*, 799 F.Supp. 198, 202 (D.D.C.1992) (passage of nearly a year precludes inference of causal connection), *cited in Cross v. Bally's Health & Tennis Corp.*, 945 F.Supp. 883, 888-89 (D.Md.1996).

    **C.**    **The Sheriff had legitimate, non-discriminatory reasons for reassigning Peregoy and relocating his office.**

Peregoy pleads not one fact to show that the Sheriff lacked a legitimate, non-discriminatory reason for reassigning him. and moving his office. As stated above, the Sheriff approved Peregoy's transfer because the move best utilized Peregoy's twenty years of correctional experience in the training of newly promoted supervisors and junior staff. Ex. 6: Tregoning Aff. Additionally, both the Warden and Sheriff believed Peregoy would be more successful in his new position than as Commander of Special Operations for reasons discussed below.

Prior to Peregoy's transfer, the Sheriff and Warden had legitimate concerns about Peregoy's attitude and competence in his prior position. For instance, the Warden had received two reports regarding Peregoy's apparent lack of diligence in supervising the collection and deposit of various inmate fees. Colonel Robert Keefer, the Sheriff's Chief

deputy, was also concerned about Peregoy's competence and attitude. On two occasions, Colonel Keefer had to order Peregoy to (1) complete a written directive in a timely manner and (3) wear a pager while on duty. Ex. 5: Tregoning Aff.

"[M]ere knowledge on the part of an employer that an employee ... has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons' for adverse personnel decisions against that employee." *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir.1994), *quoting Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989). Here, the Sheriff has articulated several legitimate reasons for relocating Peregoy's office and reassigning him to work as evening Shift Commander. Because Peregoy cannot refute the fact, based on the reasons stated above, that the operational needs of the Sheriff's Office necessitated the Sheriff's actions, his claim should be dismissed.

## IV.   CONCLUSION.

For all the foregoing reasons, it is respectfully requested that Plaintiff's Complaint be dismissed, with prejudice, or in the alternative, that Summary Judgment be granted in favor of the State defendants.

J. JOSEPH CURRAN, JR.
ATTORNEY GENERAL OF MARYLAND


_____/S/_____
FRANK W. MANN
ASSISTANT ATTORNEY GENERAL
200 Saint Paul Place
Baltimore, Maryland 21202
410-576-6576

Attorney for Defendant