1

1       IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MARYLAND

3  SALVERTORE BROWN,        *

4        Plaintiff,     *

5  v.                    *  Civil Action No.

6  GEORGE HARDINGER, et al., *  MJG 01 CV2023

7  *    *    *    *    *    *    *    *

8

9          DEPOSITION OF MARK L. PEREGOY

10

11       The Deposition of Mark L. Peregoy was

12  taken on Monday, June 3, 2002, commencing at 8:56

13  a.m. at the Offices of the State Attorney, 6 Saint

14  Paul Street, Baltimore, Maryland, and was reported

15  by Cari M. Inkenbrandt, RPR, Notary Public.

16

17

18

19

20          EVANS REPORTING SERVICE
            2 North Charles Street
21          Baltimore, Maryland  21201
               (410)727-7100

2

1 APPEARANCES:

2 FRANK MANN, ESQUIRE
      Assistant Attorney General
3    Office of the Attorney General
      200 St. Paul Place
4    Baltimore, Maryland  21202
      (410)576-6576
5        On Behalf of Kenneth Tregoning

6 HAVEN N. SHOEMAKER, ESQUIRE
      838 Main Street, Unit D
7    Hampstead, Maryland  21074
      (410)239-4600
8        On Behalf of Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

3

1              P R O C E E D I N G S

2                 MARK L. PEREGOY

3  a witness herein, called for oral examination in

4  the matter pending, being first duly sworn to tell

5  the truth, the whole truth and nothing but the

6  truth testified as follows:

7                 EXAMINATION

8       BY MR. MANN:

9     Q    Good morning Mr. Peregoy.  My name is

10  Frank Mann.  I'm representing Sheriff Tregoning in

11  this lawsuit filed by Salvertore Brown, and as you

12  probably know, Mr. Haven Shoemaker is representing

13  Mr. Brown.

14     A    Okay.

15     Q    Have you ever been deposed before?

16     A    Once.

17     Q    You have.  In what case?

18     A    It was a traffic accident.

19     Q    And what were the circumstances of that

20  case?

21     A    Some individual hit us head on and we

4

1  sued their insurance company.

2      Q    You were the plaintiff in that

3  particular case?

4      A    I was the plaintiff.

5      Q    Was that in connection with your

6  employment?

7      A    No, sir.

8      Q    Was that just a private matter?

9      A    Private matter.

10     Q    Was there a judgement in that case?

11     A    There was.

12     Q    And was it in your favor?

13     A    It was in my favor.

14     Q    Did it go to trial?

15     A    It did not.  It went to arbitration.

16     Q    So you understand how a deposition

17  works?

18     A    Yes, sir.

19     Q    I ask the questions and you provide the

20  answers.

21     A    Yes, sir.

5

1    Q    If there's any question that I ask that

2  you don't understand or you think is ambiguous,

3  will you agree to ask me to clarify it before

4  answering?

5    A    Yes, I will.

6    Q    Also, will you agree to provide complete

7  and thorough answers to all the questions that I

8  ask you?

9    A    Yes.

10    Q    Okay.  And if there's anything, part of

11  your answer that you haven't given, that you make

12  sure you supplement that answer?

13    A    Okay.

14    Q    All right.  Just for the record, can you

15  state your name and home address?

16    A    Mark Peregoy 106 Park Drive,

17  Westminster, Maryland 21157.

18    Q    Okay.  And I'm just going to ask you

19  some background questions.  First of all, what is

20  your education history?

21    A    Bachelor's degree.

6

1   Q   In what?

2   A   Criminal justice.

3   Q   From where?

4   A   University of Baltimore.

5   Q   So I assume you're a high school

6  graduate?

7   A   Yes, sir.

8   Q   What high school did you go to?

9   A   Westminster High.

10   Q    And what's your employment history after

11  college?

12   A   I came out of the military.  Well,

13  actually I went to night school to get my

14  bachelor's.  After high school I went into the

15  military for four years.  After the military, I

16  came out in 1980, started with the sheriff's

17  office in July of 1981 and worked there until

18  February 6, 2002.

19   Q   Okay.  And when you were with the

20  sheriff's office, what was your original rank?

21   A   Deputy first class.

7

1    Q    And obviously you were promoted?

2    A    Correct.

3    Q    And how did the promotion work?  How

4 many times were you promoted?

5    A    Promoted from deputy first class to

6 corporate, corporal to sergeant, sergeant to

7 second lieutenant, second lieutenant to first

8 lieutenant, first lieutenant to captain.

9    Q    Okay.  And when were you promoted to

10 captain?

11    A    I believe it was May of 2000.

12    Q    Okay.  And who was sheriff then?

13    A    Sheriff Tregoning.

14    Q    And before captain is lieutenant?

15    A    First lieutenant.

16    Q    First lieutenant?

17    A    Yes, sir.

18    Q    And who was the sheriff when you were

19 promoted to first lieutenant?

20    A    Sheriff Tregoning.

21    Q    And before that would be sergeant?

8

1    A    Second lieutenant.

2    Q    Second lieutenant.  Was Sheriff

3  Tregoning also sheriff?

4    A    I'm not sure if it was Sheriff Tregoning

5  or Sheriff Brown.  I'm not sure.

6    Q    Are you married or single?

7    A    I am married.

8    Q    Do you have any children?

9    A    Two.

10    Q    All right.  Now, what is your current

11  employment situation now?

12    A    I'm not gainfully employed.

13    Q    All right.  And you resigned from the

14  sheriff's office?

15    A    That's correct.

16    Q    When did you resign?

17    A    February 6, 2002.

18    Q    Have you worked at all since?

19    A    I have under a contractual basis for the

20  Maryland Police Training and Correctional Training

21  Commission providing instructional services.

9

1    Q    So how often do you work for the

2  Maryland Police Training Commission?

3    A    When they have courses that I'm

4  certified or qualified to teach, they will contact

5  me and I arrange my schedule so I can definitely

6  work.

7    Q    Approximately how many days have you

8  worked for them?

9    A    Since February, approximately 30.

10    Q    30 days with the Maryland Police

11  Training Commission?

12    A    Approximately.

13    Q    And what do they pay you per day?

14    A    $16 an hour.

15    Q    $16 an hour.  Do you usually work

16  eight-hour days?

17    A    Yes, sir.

18    Q    Do you work longer than that during the

19  day?

20    A    No, no, sir.

21    Q    Are you seeking employment?

10

1    A   Yes, sir.

2    Q   Where have you sought employment?

3    A   I applied at the American Correctional

4  Association based out of Lanham, Maryland.

5    Q   Uh-huh.

6    A   Applied at the preparatory school at

7  Bowling Brook in Middleburg, Maryland.  I applied

8  with U.S.I. Investigations out of Annandale,

9  Pennsylvania, their headquarters.  I have applied

10  to do background investigations for Ann Arundel

11  County Sheriff's Office and Detention Center.  I

12  think that's it.

13    Q   Does your wife work?

14    A   She does now.

15    Q   Where does she work?

16    A   She worked for Robert Morton Elementary

17  School.

18    Q   Okay.  I want to ask you about a couple

19  of incidents involving Salvertore Brown.  And they

20  are, some of them are going to be a little bit out

21  of order.

11

1          First of all, I'm interested in a

2    luncheon that occurred among people in the

3    sheriff's office on December 24th, 2001.  Do you

4    have any knowledge of that particular luncheon?

5          A    I believe it was a luncheon put together

6    by the sheriff.

7          Q    Uh-huh.

8          A    To take the secretaries out for

9    Christmas.

10         Q    Do you know where it was held?

11         A    Fenby Farms in Westminster.

12         Q    Did you attend?

13         A    I did.

14         Q    And were you invited?

15         A    I was.

16         Q    How were you invited?

17         A    Darlene Smith, the secretary, contacted

18   me about two or three weeks prior and said, "Mark

19   this date on your calendar.  The sheriff just told

20   me about this date that we're all going out to

21   lunch.  Mark it on your calendar."

12

1     Q    Okay.  Who else was invited that you

2 know of?

3     A    The sheriff, Colonel Keefer, Major

4 Tuvin, Major Stoltz, Major Long, Lieutenant Wolfe,

5 Lieutenant Stonesifer, Warden Hardinger.  I'm

6 trying to think at the tables.  There were two

7 tables full of individuals there.  Lieutenant

8 Green.

9     Q    Anyone else?

10     A    There were two full tables with about

11 ten at each table.  I know that.  I'm trying to

12 recall back at that time.

13     Q    You're naming people that attended, not

14 necessarily people who were invited?

15     A    I don't know who was invited.  I know I

16 was invited.

17     Q    Do you know of anyone else who was

18 invited to the luncheon?

19     A    I assume everyone else that was there

20 was invited.

21     Q    And you assume that because they were

13

1  there?

2     A   Correct.

3     Q   Okay.  Were you aware of how anyone else

4  was invited to that particular luncheon?

5     A   I was told that Darlene Smith contacted

6  the people that worked out of the detention center

7  and invited them.

8     Q   Who told you that?

9     A   Darlene.

10     Q   Darlene told you.  So who did Darlene

11  say she invited?

12     A   She didn't go through the list.  She

13  just said she was contacting people and telling

14  them about the luncheon.

15     Q   She didn't have a particular list of

16  people?

17     A   I don't know that.

18     Q   Okay.  Did you talk to -- so you didn't

19  see a list of people who were invited?

20     A   I did not, no, sir.

21     Q   Okay.  Now, Darlene, what's her last

14

1  name?

2  A    Smith.

3  Q    And who is she?

4  A    She's the warden's secretary.

5  Q    Did you have a secretary at the time?

6  A    No, sir.

7  Q    You didn't have any?

8  A    I've never had a secretary.

9  Q    Acting as your secretary?

10  A    Never.

11  Q    Who did you rely on for secretarial

12  help?

13  A    What type of duties?

14  Q    Secretary duties, typing.

15  A    I did my own.

16  Q    You did all your own?

17  A    Yes, sir.

18  Q    You had no people help you?

19  A    Darlene taught me how to type early on.

20  Q    Okay.  Did you talk to Mr. Brown about

21  the luncheon?

15

1    A   I did.

2    Q   And under what circumstances did you

3 talk to him about it?

4    A   I asked him if he was invited.

5    Q   When did you ask him this?

6    A   I am not sure of the date.

7    Q   Was it before the luncheon --

8    A   Yes.

9    Q   -- or after the luncheon?

10   A   It was before.

11   Q   Do you know how long before?

12   A   No, sir.

13   Q   Why did you ask him?  Why did you ask

14 him if he was invited?

15   A   I was curious.

16   Q   Why were you curious?

17   A   Because I was familiar with the

18 situation and I was curious with his lawsuit and I

19 was curious if they would invite Lieutenant Brown

20 to the luncheon.

21   Q   So you asked him with the idea that you

16

1 were trying to find out if they were going to

2 invite him because he had filed a lawsuit?

3     A   I had asked, "Were you invited to the

4 luncheon," because I was curious if they invited

5 him.

6     Q   And what did he tell you?

7     A   No.

8     Q   Okay.  And how long before?  I may have

9 asked you this before.

10     A   I don't remember.

11     Q   Was it a couple of days before?

12     A   I don't remember.

13     Q   So you couldn't put it -- you couldn't

14 give me a ballpark figure of whether it was five

15 minutes before or a month before?

16         MR. SHOEMAKER:  Objection.

17         You can answer that.

18         THE WITNESS:  I don't remember.  I'm

19 sorry.

20         BY MR. MANN:

21     Q   Okay.  In your experience with the

17

1 sheriff's office and during your employment, have

2 you heard any derogatory remarks made about

3 Salvertore Brown?

4     A    Ask the question again, please.

5     Q    During your employment, have you heard

6 any derogatory remarks made about Salvertore

7 Brown?

8     A    What I consider a derogatory remark,

9 yes.

10    Q    And who made them?

11    A    Warden Hardinger.

12    Q    What did he say?

13    A    He admitted to me that he referred to

14 Lieutenant Brown one day in a conversation, asked

15 him if he knew what the definition of a "good

16 nigger" was.

17    Q    Who said this?

18    A    Warden Hardinger told me.

19    Q    The warden told you?

20    A    The warden told me.

21    Q    So you had a conversation with Warden

18

1  Hardinger?

2    A    That's correct.

3    Q    When was this?

4    A    It was in June of 2000 at the Maryland

5  Correctional Administrators Association.  We were

6  rooming together.

7    Q    Uh-huh.  And how did this conversation

8  come up?

9    A    He started talking and advised me that

10  he had made this statement to Lieutenant Brown and

11  that Lieutenant Brown had taken it out of context

12  and that he meant nothing by it.

13    Q    Okay.  And do you know what the

14  circumstances, how this conversation began?  Did

15  he just blurt it out?

16    A    We were discussing a lot of issues of

17  work --

18    Q    Uh-huh.

19    A    -- personal life, and he brought it up.

20    Q    So he told you that Mr. Brown had taken

21  it out of context?

19

1    A   He told me, he explained why he thought

2  that.  He stated that it was something that his

3  father, a term his father had used and he was

4  asking Lieutenant Brown about that term, or

5  something to that effect.

6    Q   Uh-huh.  Did he direct the word nigger

7  towards Lieutenant Brown?

8    A   I wasn't in the meeting when he said it.

9  I know that Lieutenant Brown --

10    Q   According to the conversation you had

11  with him.

12    A   With the warden?

13    Q   Yes.

14    A   Yes.

15    Q   He directed it towards Brown?

16    A   He, Lieutenant Brown, was in the room,

17  and he said, he asked Lieutenant Brown, "Do you

18  know what the definition of a good nigger is?"

19    Q   And he admitted that that's what he

20  said?

21    A   Yes, sir.

20

1    Q    Verbatim?

2    A    Yes, sir.

3    Q    What else did he say about this

4 conversation?

5    A    That it was taken out of context.  He

6 felt as though Lieutenant Brown had taken what he

7 said out of context.

8    Q    Was there anything else about this

9 conversation?

10    A    And that it was a phrase that his father

11 had used and he just never understood what that

12 meant.

13    Q    Who had never understood what it meant?

14    A    The warden said he never understood what

15 that term had meant.

16    Q    And what term are you referring to?

17    A    Good nigger.

18    Q    So the warden was saying he didn't

19 understand what that term had meant --

20    A    Correct.

21    Q    -- to you?

21

1        Okay.  Any other remarks?

2     A   No.

3     Q   Why did you view that as a derogatory

4  remark about Salvertore Brown?

5     A   I find that term very offensive.  It's

6  the way I was raised.

7     Q   Did Warden Hardinger call Salvertore

8  Brown a nigger?

9     A   The term was used.  Here again, I wasn't

10  directly in their meeting.

11     Q   What I'm asking you is why you interpret

12  that as a derogatory remark?

13     A   I find it derogatory here, me sitting

14  here saying it to you, even though I'm not an

15  African-American, you repeating it back to me.

16  That's the way I was brought up.  That's the way I

17  was raised.  I find it very offensive and very

18  derogatory.

19     Q   So the use of the term you find

20  derogatory?

21     A   That's correct.

22

1    Q    Anything else, any other derogatory

2  comments you have heard about Salvertore Brown?

3  And we can stick with Warden Hardinger right now.

4    A    Warden Hardinger made this statement to

5  me here again July, a month later.

6    Q    July of what year?

7    A    July of 2000.

8    Q    Uh-huh.

9    A    He made the statement while we were

10  walking around.  He wished Lieutenant Brown would

11  just go away on sabbatical.

12    Q    And were there any other witnesses to

13  this statement?

14    A    No, no, sir.

15    Q    Okay.  And why did you interpret that as

16  being derogatory towards Salvertore Brown?

17    A    I just felt as though it was targeting

18  him, that he wanted him to leave.

19    Q    Okay.

20    A    Move on.

21    Q    Now, the conversation you had with

23

1 Warden Hardinger about the use of the word nigger,

2 were there any other witnesses to that

3 conversation?

4    A   When he admitted saying it to me?

5    Q   Yes.

6    A   No, sir.  We were in our hotel room.

7    Q   All right.  Did you talk to Warden

8 Hardinger about the use of that word?

9    A   No, sir.

10    Q   Did you voice your opinion about the use

11 of that word?

12    A   No, sir.

13    Q   Any other remarks by Warden Hardinger

14 that you would view as derogatory about Salvertore

15 Brown?

16    A   None that I can recall at this time.

17    Q   Now, you say you heard in July 2000 that

18 Warden Hardinger made some comment about he wished

19 Lieutenant Brown would take a sabbatical.  Did you

20 repeat that comment to anyone?

21    A   I did.

24

1    Q    To whom?

2    A    Sergeant Walter Royster.

3    Q    Okay.  And why did you find it necessary

4    to repeat that comment to Sergeant Royster?

5    A    I wanted Sal, Lieutenant Brown, to be

6    aware of what was said and to be careful because,

7    as I said, I thought that he was being targeted

8    and I wanted Sergeant Royster to let him know to

9    cross all his T's and dot his I's.

10    Q    Did you tell Mr. Brown this comment?

11    A    I did not.

12    Q    Did you tell anyone about your

13    conversation with Warden Hardinger when you used

14    the term nigger?

15    A    I don't recall.

16    Q    Okay.  Now, most of these documents I'm

17    going to show you -- by the way, did you bring any

18    documents?

19    A    I brought the one, the only thing that I

20    have, the statement where Sheriff Tregoning

21    referred to African-Americans.

25

1   Q   Do you have any other documents?

2   A   No, sir.

3   Q   And did you read the subpoena?

4   A   I did, but I have nothing else.

5   Q   Okay.  All right.  When I'm identifying

6 these documents, I'm just going to use the last

7 two digits.  This is marked No. 44.

8       MR. MANN:  Do you need a copy?

9       MR. SHOEMAKER:  No.

10      BY MR. MANN:

11  Q   Can you identify this document?

12  A   This is my resignation.

13  Q   Your resignation letter?

14  A   Yes, sir.

15  Q   And is there a date on it?

16  A   February 7th, 2002.

17  Q   When did you resign from the sheriff's

18 office?

19  A   February 6th, 2000.  I believe it was

20 the last day I was paid.

21  Q   Uh-huh.  Okay.  Now, I want to ask you

26

1  about some things that are written in this

2  document.  You had said a few minutes ago that

3  Warden Hardinger had used the term nigger in a

4  conversation with you.  Have you heard anyone else

5  use that term at the sheriff's office?

6      A   Me personally have I heard?

7      Q   Yes.

8      A   I don't believe I have.

9      Q   Okay.  And I believe there's testimony

10  that when Warden Hardinger used that term you did

11  not report it to anyone?

12      A   No.  I said I don't recall.  I don't

13  recall who, if I told anyone about him saying that

14  to me.

15      Q   Okay.  Do you have any problems with

16  your memory?

17      A   Just age.

18      Q   Have you ever gone to a doctor to talk

19  to anyone about your memory?

20      A   No, sir.

21      Q   So you're not aware of any kind of

27

1  problems affecting your memory?

2      A    No, sir.

3      Q    All right.  Now, you wrote in this

4  letter -- let me just go through it sort of bit by

5  bit.  The third line of the letter or the second

6  line, the end of the second line says, "My

7  continued employment at the detention center has

8  become impossible."  Is that what you wrote in

9  this letter?

10     A    Yes, sir.

11     Q    And what did you mean by that statement?

12     A    I felt that it was impossible for me to

13  continue to work there.  I would be hypocritical

14  to work for an administration that I felt is

15  racist.

16     Q    And why did you think the administration

17  was racist?

18     A    Off of what Warden Hardinger said to

19  Lieutenant Brown.  He never apologized for it.  He

20  tried to alibi it saying it was taken out of

21  context, other statements that Sheriff Tregoning

28

1  made in my presence that were --

2     Q    What were those statements?

3     A    -- racist in nature.

4     Q    What were those statements?

5     A    I believe that's what I have here, where

6  he referred to African-Americans as spooks.

7     Q    Okay.  What was the circumstance

8  regarding that conversation?

9     A    My wife and I just come back, returned

10  from vacation in Pucotana (phonetic) and at the

11  time there was some civil unrest there and I was

12  talking to Major Turvin in his office about how

13  unwise of a decision it was for my wife and I to

14  go to such a place during civil unrest, but it was

15  a beautiful resort and we had a lovely time and we

16  were talking about that, and Sheriff Tregoning

17  walked into the office.

18     Q    Uh-huh.

19     A    And we were talking about, I was saying

20  how certain places you just had to be careful to

21  go.  They said you didn't want to go downtown and

29

1  that type of thing, and then the sheriff relayed a

2  story to us that he was outside of Chicago getting

3  gas, he needed gas, he pulled off the interstate,

4  pulled into a gas station, the attendant walked

5  out asked, "What are you doing in this area," and

6  the sheriff said, "Why?  I need gas.  What's up?"

7  And the individual pointed across the street and

8  said, "Well, look over there."  And Sheriff

9  Tregoning said he turned around and looked and he

10  saw some individuals stripping a car.  And he

11  yelled out, "Hey, what are you doing," and then

12  Sheriff Tregoning said, "You should have seen

13  those spooks take off."  And at first I thought

14  that man didn't say what I just thought he said.

15     Q   Okay.

16     A   I thought I misheard him.  And he put

17  his hand to his mouth and said, "Ooh, I said

18  spooks.  I guess I shouldn't say that."

19     Q   Was anything else said at that

20  conversation?

21     A   I don't believe so, not that I can

30

1  remember.

2    Q    So you had -- did you have any

3  particular reaction to that comment?

4    A    I was shocked.

5    Q    Did you have any verbal reaction?

6    A    No, sir.

7    Q    Okay.  Did you report this conversation

8  to anyone?

9    A    When the sheriff left, I looked at Major

10  Turvin and I said, "I can't believe he just said

11  that," and Major Turvin agreed.

12    Q    How did he agree?

13    A    He said, "I know," something to that

14  effect, "I know.  I can't believe he said it

15  either."

16    Q    Did you report this incident to anyone

17  else?

18    A    No, sir.

19    Q    Okay.  I see that --

20    A    Lieutenant Brown.

21    Q    -- you have put it in writing, however?

31

1    A    That's correct.

2    Q    And what was the approximate time?  When

3  did this conversation occur?

4    A    January of 2001, I believe, or February,

5  January or early February 2001.

6    Q    That's when the --

7    A    Yes, we had come back from -- we went to

8  Pucotana (phonetic) in January, and it was after

9  we had come back.  I'm not sure if it was a week

10  after.

11    Q    Uh-huh.

12    A    But I was sitting in Major Turvin's

13  office and we were discussing the vacation.

14    Q    Okay.  And you typed this up?

15    A    I did.

16    Q    Is that your work?

17    A    That's it.

18    Q    When did you type it up?

19    A    February the 9th.

20    Q    Of what year?

21    A    2002.

32

1    Q    Okay.  So is there a particular reason

2  that you did it a year later?

3    A    I was talking to Lieutenant Brown, and

4  as the case was starting to come closer, he asked

5  me if I would mind writing something up, and I

6  said absolutely not.

7    Q    So you wrote it up at Mr. Brown's

8  request?

9    A    Correct.

10    Q    And I'm sorry, I might have already

11  asked you this.  You didn't report it to anyone

12  else in the interim?

13    A    No, sir.

14    Q    Okay.  Well, we got off the track.  I

15  had asked you why you felt your employment at the

16  detention center had become impossible.  Were

17  those the only reasons?

18    A    I felt that if I continued to work there

19  I would have been viewed as a hypocrite.

20    Q    Okay.  Were there any other incidents of

21  racism that you experienced?

33

1     A    That I experienced?

2     Q    That factored into your decision to

3  resign?

4     A    Sheriff Tregoning made some disparaging

5  remarks one day, an offensive remark about Asians.

6     Q    When did he do that?

7     A    It was approximately April of 2001.

8     Q    Uh-huh.

9     A    April or May.

10    Q    Okay.  And what was the remark?  What

11  did he say?

12    A    Darlene Smith -- I was sitting in my

13  office at the time, which was up near the warden's

14  office back then.

15    Q    Uh-huh.

16    A    And Darlene Smith came in and asked me

17  if I wanted a chocolate chip rice cake.  I said,

18  "Yes, sure."  And I tasted it.  She gave me one.

19  And about that time the sheriff came walking in.

20    Q    Uh-huh.

21    A    And Darlene said, "Sheriff, would you

34

1  like a rice cake," and he said, "No, my name is

2  not Cho Won Lee."

3      Q    Those were his exact words?

4      A    Cho Won Lee is what he said, yeah, it

5  was an Asian name.

6      Q    Uh-huh.  Okay.  Did he say anything

7  else?

8      A    No, sir.

9      Q    Did you say anything after you heard

10  this remark?

11      A    No, sir.  I was sitting in my office,

12  and I shook my head.  The sheriff walked out, he

13  walked back to the warden's office, looked in, saw

14  me sitting there, walked out of the office and

15  never said anything to me.  And I went to Darlene

16  and I said, "Did you hear him say that?"  She

17  said, "Yes, I did."  She goes, "Mark, I don't

18  think he meant anything by it."  I said, "Well,

19  it's stereotyping a whole culture."

20      Q    So was she the only witness to that

21  conversation?

35

1    A    Yes.

2    Q    Okay.  Any other remarks or acts of

3  alleged racism which you felt made your employment

4  there impossible?

5    A    We had a supervisors meeting.  I had

6  come back from neck surgery in October of 2001,

7  and we had a supervisors meeting, I believe it was

8  a month later.  And I brought up in the

9  supervisors meeting something that I observed.

10  There was, it's a table about the same length as

11  this one, about the same size.

12    Q    This table is about 15 feet long?

13    A    Yes.  And we had that in our officers

14  roll call room, and I walked in the room one day

15  and I saw ten white male and females sitting

16  around the table.

17    Q    Uh-huh?

18    A    Laughing, talking, conversing.  And I

19  saw two female African-Americans sitting off to

20  the side, and no one was talking to them.

21    Q    At the same table or a different table?

36

1    A    There was no table.  They were sitting

2  off away.

3    Q    So there was a table, but they were not

4  sitting at it?

5    A    There were no chairs.  There was no

6  place for them to sit.  It was all white males,

7  females sitting at this table.  All the chairs

8  were gone.  The two female African-Americans were

9  sitting off to the side by themselves.

10    Q    You say there were no chairs but they

11  were sitting?

12    A    There were no other chairs at the table.

13    Q    But they were sitting in chairs?

14    A    They were sitting in chairs, yes, sir,

15  off to the side.

16    Q    Okay.  So you saw two African-Americans.

17    A    Females.

18    Q    Females.  And what happened?

19    A    I went over and sat down next to the one

20  and asked her, "Why aren't you sitting at the

21  table with everybody else?"  And she said, "Am I

37

1  supposed to?"

2     Q    And who is this you talked to?

3     A    Her name was Wilson.  Last name was

4  Wilson.  I'm not sure of her first name.

5     Q    Okay.  And was she an employee?

6     A    She was a new employee.  I'm not sure

7  when she was hired, but she was still on

8  probation.

9     Q    Okay.  And was this Lakeshia,

10  L-A-K-E-S-H-I-A?

11     A    I just know her as Wilson.

12     Q    Her last name was Wilson?

13     A    Her last name was Wilson.

14     Q    Okay.  And you said to her?

15     A    I asked her why she wasn't sitting at

16  the table with everyone else.  And she responded,

17  "Am I supposed to?"  And I went on to say, you

18  know, "This is your shift.  This is your agency.

19  You know, it's important, you know, that people

20  make you feel welcome."  You know, so then I

21  started asking her a little bit about her own

38

1  prior experience, where she came from as far as

2  employment.

3     Q   Uh-huh.

4     A   And generate a conversation with her.

5         In the supervisors meeting I brought

6  this incident up.  Sheriff Tregoning was there and

7  Warden Hardinger was there at the supervisors

8  meeting.

9     Q   That was in October of 2001?

10    A   October or November.  I came back to

11 work October 15th, I believe, so it would have

12 been close to November because they have them once

13 a month.

14    Q   Before you go on, did Ms. Wilson say

15 anything else to you other than, "Am I supposed

16 to?"

17    A   No, sir.  Well, we talked about her

18 previous employment a little bit.

19    Q   Okay.  And where was her previous

20 employment?

21    A   Super Max, working for the division of

39

1  corrections.  She's a very qualified individual.

2      Q    Okay.  Was there a conversation about

3  racism or --

4      A    No, sir.

5      Q    -- or racial --

6      A    No, sir.

7      Q    This was just a conversation about

8  working at Super Max?

9      A    Yes.

10     Q    And so you said -- was it the next day

11  you were at the supervisors meeting?

12     A    No, sir.  Sometime in November.  I think

13  they usually hold them the first Tuesday of every

14  month.

15     Q    So how long after this?

16     A    It was about, it was less than a week.

17     Q    Okay.

18     A    It was less than a week because it was

19  fresh on my mind.  We have an agenda that we

20  discuss, and I knew I wanted to bring it up in the

21  supervisors meeting.

40

1    Q    Do you recall the other African-American

2  female at the table?

3    A    I know her name if I heard it, but I

4  just can't remember that.

5    Q    Okay.  So what happened at the

6  supervisors meeting?

7    A    We went around the room and asked if

8  anybody had any issues, as we always do, and I

9  brought up this incident.  And I stated that, you

10  know, it's our responsibility as people who work

11  in this agency to make everybody feel welcome,

12  that I noticed this, and I don't know what the

13  circumstances were surrounding it, I said, but

14  these are people that belong to this agency, and

15  we don't just let people sit off to the side and

16  not pay any attention to them.  We have an

17  obligation to make them feel welcome.

18    Q    Those were roughly your exact words?

19    A    Roughly.

20    Q    Okay.  And what happened?

21    A    I stated that.  Sheriff Tregoning was

41

1  sitting there.  Warden Hardinger was sitting

2  there.  And neither one of them said a word.

3  There was dead silence in the room.

4      Q    Okay.

5      A    And that implied to me that they didn't

6  want to discuss it, they didn't care about it.

7      Q    Okay.  And your conversation with the

8  two African-American females, the only thing they

9  said regarding why they were sitting in one spot

10  and not at the table was, "Am I supposed to"; is

11  that right?

12      A    "Am I supposed to?"

13      Q    There was no other conversation --

14      A    No, sir.

15      Q    -- about anything that had happened

16  prior to that?

17      A    Not that I remember.

18      Q    They had no complaints?

19      A    No, sir.  The one girl, I believe, had

20  already filed.

21      Q    No, I'm sorry.  They didn't have any

42

1  complaints about the situation involving the

2  table?

3      A   Not that they voiced to me, no, sir.

4      Q   Okay.  Anything else?  We were on the

5  subject of incidents which you had identified as

6  making employment at the sheriff's office

7  impossible.

8      A   I felt as though I became the target.

9      Q   Can you explain that.

10     A   The top administration knew my support

11  for not just Sal Brown but for -- they would ask

12  me repeatedly, almost on a monthly basis, either

13  the sheriff or the warden or Colonel Keefer, "Do

14  you think we have racial problems in this agency?"

15  And every time I said, "Yes, I do."  And they

16  would either dismiss me or distort what I said.

17  They'd reframe it to make it work for them.

18     Q   And how did they do that?

19     A   "Well, we really don't think so, Mark.

20  We don't really think there's any racial problems.

21  We don't know of any.  People just have difference

43

1  of opinion."

2     Q    Who said that?

3     A    Colonel Keefer, Warden Hardinger, the

4  sheriff.

5     Q    They both said that to you?

6     A    They would either ask me, you know, they

7  would say, you know, "Do you think we have racial

8  problems?  How do you think things are racial-wise

9  here?"  And I always, whenever they asked me, I

10  said, "I believe we have some racial issues, yes.

11  I think there's some concerns.  I've worked here

12  for 20 years, and I've never seen things as bad as

13  they have been over the last two years."

14     Q    Okay.  Do you remember specific

15  conversations you had with these individuals.

16  You've identified Warden Hardinger and who else?

17     A    Colonel Bob Keefer.

18     Q    Colonel Keefer.  Any specific

19  conversations?

20     A    I think the most recent one that I can

21  recall was with Colonel Keefer.

44

1    Q   Uh-huh.

2    A   And Sergeant Royster was present at that

3  one.

4    Q   And what happened?

5    A   Colonel Keefer had called me over to

6  teach a cultural diversity class like a Wednesday

7  afternoon and told me he wanted it set up for

8  Monday to start teaching it.  And I explained to

9  him that I could not do that.

10    Q   Uh-huh.

11    A   We needed more time to prepare the class

12  and get the instructors familiar with their lesson

13  plan.

14    Q   So he gave you how many days notice?

15    A   Approximately four.

16    Q   Uh-huh.  And let me just back up.  I

17  think that somewhere you said you were the

18  cultural diversity trainer?

19    A   I'm a certified as a cultural diversity

20  instructor.

21    Q   When did that occur?

45

1    A   I put myself through the training May of

2  2001.

3    Q   When you say put yourself through the

4  training --

5    A   I was in charge of all training for the

6  agency.  And I signed myself up to go become

7  certified as an instructor for the Maryland Police

8  Training and Correctional Commission in Cultural

9  Diversity.

10    Q   And what kind of training did you go

11  through?

12    A   It was a week-long course.

13    Q   And you were certified in May of 2001

14  you said?

15    A   Yes, sir.

16    Q   Okay.  And how long did you remain in

17  that position?

18    A   What position?

19    Q   As the cultural diversity trainer.

20    A   Until February 6th of 2002.

21    Q   Uh-huh.  And what were your duties as

46

1  cultural diversity trainer?

2      A    To provide instructional services to

3  individuals in the agency on cultural diversity.

4      Q    All right.  Any other duties?

5      A    I don't understand the question.

6      Q    Besides teaching individuals, were there

7  any other duties, any other responsibilities?

8      A    I had a lot of other responsibilities,

9  yes, sir.

10     Q    As the cultural diversity trainer?

11     A    Oh, no, sir.

12     Q    In your training, was there a process

13  for making complaints that you would instruct the

14  employees on?

15     A    I did.

16     Q    What was the process?

17     A    That they could contact either the fair

18  practices officer, which was Sergeant Royster,

19  they could contact the County Attorney's Office,

20  they could contact the human relations office, or

21  they could contact the EEOC.

47

1    Q    When you say "could contact," were these

2    choices that they could contact anyone they wanted

3    to?

4        A    It was in our policy and procedure.  I

5    was reading right out of our policy, Sheriff

6    Tregoning's policy and procedure.

7        Q    So they could contact one but not the

8    other, if they wanted to, according to the

9    procedure?

10       A    If they had a complaint they could file

11   it with any of those agencies.

12       Q    Okay.  And did you teach them as to who

13   had standing to make a complaint, what the

14   requirements were for having standing to make a

15   complaint?

16       A    I instructed them if that they felt that

17   there had been discrimination or sexual harassment

18   against them that they had the option of pursuing

19   that and filing with these agencies.

20       Q    Did you -- and I'm talking about policy,

21   and since you were the cultural diversity trainer,

48

1 I wanted to ask you a few questions about this.

2 For instance, would someone have to be a victim of

3 discrimination to make a complaint or could

4 someone make a complaint if they felt someone else

5 was a victim?

6    A   I think, I always said that if you were

7 offended, if you felt as though you were offended

8 by something you could file a complaint.

9    Q   Okay.  So you didn't have to be the

10 victim yourself?

11    A   If you felt like you were offended by

12 what took place, you had a right to file a

13 complaint.

14    Q   Okay.  I'm sorry we got off track for a

15 minute.  I just wanted to get an idea of what it

16 meant to be a cultural diversity trainer.

17       So you remember a conversation with

18 Sergeant Royster?

19    A   Yes, sir.

20    Q   And Colonel Keefer asked you to teach a

21 class and he gave you four days notice.  What

49

1  happened after that?

2      A   I explained to him that I didn't have

3  the lesson plan completely prepared.

4      Q   Uh-huh.

5      A   You know, you have to give the lesson

6  plan out to your other instructors, to Sergeant

7  Royster, who was also an instructor, and have them

8  familiarize themselves with the lesson plan.

9      Q   Uh-huh.

10      A   Also the group size, because of the

11  time, he said he wanted everybody in the agency

12  trained in three dates, and I voiced my concern

13  with that.

14      Q   Uh-huh.

15      A   That that would mean there would be

16  close to 50 people in each class, and that's not a

17  productive number to work with in cultural

18  diversity class, unless they want me to stand up

19  there and read out of a book.  Cultural diversity,

20  there's a lot of -- there should be a lot of

21  interaction, and with 50 people, it's too large of

50

1  a group.

2    Q    So how many people should there be in a

3  group?

4    A    No more than 24.

5    Q    Is there any resource material which

6  that is based on?

7    A    Training commission.

8    Q    So this came from information you got

9  from the training commission that the class should

10  be no larger than 24?

11    A    Yes, sir.

12    Q    How much time did you need to prepare

13  for a class of this type?

14    A    To have my lesson plan done?

15    Q    Yes, uh-huh.

16    A    I think I got the lesson plan done in

17  about three or four days.

18    Q    Okay.  So you were able to put the

19  lesson plan together in three or four days?

20    A    No, sir.  We decided that -- this was in

21  I think December, early December.

51

1    Q    Of what year?

2    A    Of 2001, when Colonel Keefer talked to

3    us, and there were a lot of other variables

4    involved here, overtime, in-service training

5    hours, money.

6    Q    The question I'm asking is, how long did

7    it actually take to put the lesson plan together

8    for this type of class?

9    A    Once I sat down and started putting it

10    together, it took me about four days.

11    Q    Did you in fact teach this class?

12    A    I did, two.

13    Q    It was two classes?

14    A    Well, we had it set up for three dates.

15    I taught two of them.  I resigned before I could

16    teach the third one.  Consequently it was

17    cancelled.

18    Q    And how many people attended those two

19    classes?

20    A    I have to look at the attendance roster.

21    I set it up so there were, I believe, 20.  What we

52

1  decided to do was -- what Colonel Keefer decided

2  to do was just send the people that had not had

3  any cultural diversity training previously.  If

4  they had training a year ago or two years ago,

5  they would not be retrained at that time.  And it

6  came down to where we had about 60, 65 people that

7  needed the training in the agency.

8      Q    And how many people were in each class?

9      A    I have to look at the attendance sheet.

10  I scheduled about 20, but how many actually showed

11  up, I would have to look at the attendance sheet.

12     Q    You scheduled about 20 for each class?

13     A    About that, yes, sir.

14     Q    Okay.  And those classes did occur?

15     A    Two of them occurred.  I believe they

16  were February 4, if that's a Monday.  We teach on

17  Mondays.  February 4th and then the 11th I guess

18  would be the next one.

19     Q    I'm a little confused because you said

20  the conversation occurred in December of 2001, but

21  the classes occurred two months later?

53

1     A    After I expressed my concern with

2    Colonel Keefer about getting a lesson plan done,

3    having the instructors familiarize themselves with

4    the lesson plan, we decided these were the dates.

5    And then we had to get the room set up, get it

6    assigned to us through the community college.  So

7    by the time all that, Colonel Keefer set the dates

8    for February.

9     Q    Okay.  So you essentially had two months

10   to prepare for it?

11    A    Yes, sir.

12    Q    All right.  Was there anything else

13   about the conversation that concerned you or

14   bothered you?

15    A    He again asked me if I had -- if there

16   were racial, at the time he asked me if I thought

17   there were racial issues in the agency, and I

18   said, "Yes, sir, I do."

19    Q    What did he say?

20    A    He wanted to know whose fault it was.

21    Q    And what did you say?

54

1    A    I said it's everybody fault in this

2   agency if we don't make people feel welcome and we

3   don't handle things accordingly.  It's all our

4   responsibilities as administrators to operate this

5   facility functionally.

6    Q    Was anything else said in that

7   conversation?

8    A    A lot.  I got rather heated.  I

9   explained -- well, I explained to him that -- he

10   said he disagreed, he didn't think there were

11   racial issues in the agency.  And I said, "Well,

12   there certainly are."  And at that time I said,

13   "There's an individual that a higher rank than me

14   that referred to Asians in a stereotypical manner

15   that was very offensive to me."  And he wanted to

16   know who that was.  And I said, "I am not telling

17   you, but I can tell you he outranks me."

18    Q    Uh-huh.  Okay.  What else was said?

19    A    Colonel Keefer just said, "Well, I don't

20   believe we have racial problems here."

21    Q    And did you have -- I'm asking you to

55

1  tell me everything you remember about that

2  conversation.

3    A   I know.

4    Q   I understand.

5    A   It lasted probably about 15 minutes.

6  And here again, I told him about the incident at

7  the table where the sheriff and the warden were

8  sitting there at the supervisors meeting, and I

9  brought it up about that incident at the table,

10  and they never commented on it.  Because he

11  started to say, "Well, you need to do this."

12        I said, "Wait a minute, colonel.  You

13  know, there the warden is.  They outrank me.

14  There the sheriff is, the top man, I bring this

15  situation up in a supervisors meeting and they

16  remain silent.  What does that imply?  I know what

17  it imply to me, that they don't care."

18        And the colonel said "Well the sheriff

19  does care.  The sheriff is very concerned."

20        I said, "Well, that's not the impression

21  I got."

56

1    Q    Okay.  Anything else about this

2  conversation?

3    A    No, sir.  Sergeant Royster got me out.

4  He said, "Let's go work on the lesson plan."

5    Q    Okay.  All right.  Were there other

6  conversations that you had with management along

7  this line that you can remember specifically?

8    A    No, sir, not specific incidents.

9    Q    Okay.  Let's see.  All right.  Now, it

10  says here in your letter of resignation, "Because

11  I was truthful about the use of the term nigger by

12  Warden Hardinger, my office was taken away, my

13  position as commander of special operations was

14  eliminated and I have been reassigned to a

15  position designed to force my resignation."

16       First of all, I want to ask you, what do

17  you mean by "Because I was truthful about the use

18  of the term nigger by Warden Hardinger."

19    A    I told Kim Millender, the county

20  attorney, when she did her investigation.

21    Q    When did you talk to her?

57

1    A    When she interviewed everyone.  She did

2  an interview on a lot of people in the agency

3  after Lieutenant Brown filed a complaint.  I was

4  one of those individuals.  I'm not sure the date

5  that she did the interview, but I was very candid

6  with her and told her that I found the term very

7  offensive, derogatory.  She asked me, "What do you

8  think should happen to fix this?"  And I said, "I

9  believe Warden Hardinger should be fired."

10    Q    Uh-huh.  Okay.

11    A    And I was very candid with her about it.

12    Q    So did you talk to anyone else about it?

13    A    Major Turvin and I discussed it.

14    Q    When did you talk to Major Turvin about

15  it?

16    A    It was an ongoing process, ever since

17  the time that the term was used.

18    Q    Uh-huh.

19    A    And Lieutenant Brown, you know, came to

20  us and, you know, told Major Turvin and I what had

21  taken place and what had been said, and we, you

58

1  know, the first time we said, "You need to go to

2  the sheriff and explain this to him."

3        But ever since that term has been used,

4  Major Turvin and I would have conversations

5  between each other that, you know, how we just

6  don't understand how a person could continue in a

7  position and no one do anything for using a term

8  like that in this day and age.

9    Q    When you had a conversation with Warden

10  Hardinger about the use of the term nigger, how

11  long after this conversation with Mr. Brown did

12  that conversation take place?

13    A    The conversation with Warden Hardinger?

14    Q    That you had.

15    A    I'm not clear on the question.

16    Q    When you two were in the hotel room.

17    A    Yes.

18    Q    How long after, do you know what the

19  date of that was?

20    A    In the hotel room?

21    Q    Uh-huh.

59

1    A   It was June of -- it was at the MCAA

2 Conference and that goes on every June of the

3 year.  It was the last time I went.  It's going on

4 right now.

5    Q   So June of 2000?

6    A   This is 2000.  I did it last year.  Yes,

7 it would have been June of 2000.

8    Q   Was that the first time you heard of

9 this situation in this conversation?

10    A   No, sir.

11    Q   When was the first time you heard of the

12 situation?

13    A   The day after it happened, Lieutenant

14 Brown brought it to my attention.  He called me at

15 home.

16    Q   Okay.  What happened during that

17 conversation?

18    A   Lieutenant Brown called me up and said,

19 "I need to talk to you about something."

20    Q   Uh-huh.  And what did Brown say?

21    A   Because I was in his direct chain of

1  command.

2    Q   What did Lieutenant Brown tell you?

3    A   He told me he was in a meeting with the

4  warden and he was under the assumption that

5  meeting was going to be conducted because inmates

6  had threatened his life.

7    Q   Uh-huh.

8    A   And the warden never mentioned anything

9  about the inmates threatening his life.  He just

10  came out and said, "Do you know what the

11  definition of a good nigger is?"

12    Q   So Lieutenant Brown told you no one

13  talked about any threats by any inmates?

14    A   That's correct.  Warden Hardinger did

15  not discuss that, and that's what he thought

16  Warden Hardinger was going to discuss with him.

17    Q   Did anybody discuss that?

18    A   I don't know if they did or not.

19    Q   You said Warden Hardinger did not talk

20  about threats from inmates?

21    A   When Warden Hardinger used the term --

61

1    Q    I'm talking about during this

2  conversation.

3    A    During the conversation he told me that

4  he was under the assumption that Warden Hardinger

5  was going to discuss --

6    Q    Right.

7    A    -- Lieutenant Brown's life being

8  threatened by inmates.

9    Q    Uh-huh.

10    A    But that did not occur.

11    Q    So there was no mention of any

12  conversation of Lieutenant Brown's life being

13  threatened by inmates?

14    A    That's what Lieutenant Brown told me.

15    Q    Okay.  What else did Lieutenant Brown

16  tell you?

17    A    He wanted to know what he should do.

18    Q    About what?

19    A    The term that was used.

20    Q    All right.  And, I mean, was there

21  anything else that Lieutenant Brown relayed about

62

1  that conversation?

2      A    He just, he went on about he couldn't

3  understand why somebody would say this to him.

4  And he said, you know, he was very upset by it.

5  And I, you know, I asked where was the warden

6  going with this, what was his objective.

7      Q    What did Lieutenant Brown say?

8      A    He said he had no idea what his

9  objective was.

10      Q    What was said?

11      A    I don't remember anything else.

12      Q    And did you give Mr. Brown any advice?

13      A    I did.  I told him he needed to go to

14  the sheriff with his complaint.

15      Q    Okay.  Now, were you the cultural

16  diversity trainer at this point?

17      A    No, sir.

18      Q    This was prior to that.  All right.  Was

19  anything else said during that conversation with

20  Mr. Brown?

21      A    Not that I can recall right now.

63

1    Q    Okay.  Did you talk to anyone else about

2  Warden Hardinger's use of the term nigger besides

3  Kim Millender and Mr. Brown?

4    A    Major Turvin and I discussed it.

5    Q    And when was that?

6    A    We discussed it the very -- when Sal

7  Brown called me up that night, the next day I

8  talked to Major Turvin about it.

9    Q    Okay.  And what did you say to Major

10  Turvin?

11    A    I let him know what Lieutenant Brown had

12  told me, that the warden had used this term.

13    Q    Uh-huh.

14    A    And he didn't know where he was going

15  with it or why he used it.

16    Q    Uh-huh.

17    A    And I said -- I directed him to go to

18  the sheriff with it, and Major Turvin agreed.

19    Q    Okay.  Anything else said?

20    A    Not that I can recall.

21    Q    All right.  Now, you state in your

64

1  letter your office was taken away?

2      A    Yes, sir.

3      Q    What happened there?

4      A    My office was up in the administrative

5  area right next to the warden and the assistant

6  warden.  And I was out for neck surgery from

7  July 26th, I had neck surgery, until October I

8  think 15th.

9      Q    Uh-huh.

10     A    I think.  I have to check my medical

11  record.

12     Q    Okay.

13     A    And when I came back I was told that I

14  had been moved out of my office, they needed it

15  for a secretarial person to do secretarial duties,

16  recordkeeping.  And I said, "Well, where am I

17  supposed to go?"  And the warden said, "Go find a

18  place.  Just go find a place."

19     Q    You have a private office?

20     A    I did.

21     Q    And were there any places available?

65

1     A    None that I knew of.  I searched.  So I

2  went downstairs and I asked Lieutenant Brown if he

3  would mind sharing an office with me.

4     Q    Uh-huh.

5     A    A lot of people were going to move out

6  of their offices to get me an office, the people

7  that fell under my supervision, and share an

8  office, and I said, "No, we're not going to do it

9  that way."

10    Q    So did you share an office with

11  Lieutenant Brown?

12    A    I shared an office with Lieutenant

13  Brown, which was a utility closet/file room that

14  had been converted into an office.

15    Q    Were there any other vacant spaces for

16  you to have an office?

17    A    Not that I knew of.

18    Q    Okay.

19    A    I was never told that "This area is

20  available, Mark."  No one told me that these areas

21  are available.  I was told "Go find a place."

66

1   Q   Did you do an investigation to see if

2 there were any areas available?

3   A   I looked around, yes, sir, and

4 everyplace I looked there was someone occupying

5 it.  And without displacing other people, I didn't

6 know where I was going to go.

7   Q   Okay.  How long did it take you to

8 decide that you were going to share an office with

9 Lieutenant Brown?

10   A   A day.

11   Q   Did you talk to anybody else about

12 trying to find an office?

13   A   No, sir.  Maybe Major Turvin.  I don't

14 know.  Major Turvin and I conversed a lot, and I

15 may have said, you know, "I don't know where I'm

16 going to go," or "I don't know what I'm going to

17 do."

18   Q   And you talked to Mr. Brown about it?

19   A   I asked him if he minded sharing an

20 office with me.

21   Q   And do you recall talking to anyone else

67

1  in the sheriff's office about finding another

2  office?

3      A    You know, Sergeant Royster, everyone,

4  you know, everyone who worked under my supervision

5  knew what the situation was.  They knew that I was

6  looking for an office.

7      Q    Who had authority to assign you an

8  office?

9      A    The warden, the sheriff, Colonel Keefer.

10     Q    Did you talk to them about getting

11 another office?

12     A    I tried to talk to the sheriff about it.

13 I ran into him one day or that day, and I was

14 still in the neck brace, and he, out in the

15 parking lot, he stopped me and wanted to know how

16 I was doing.  I told him, "Well, my neck is coming

17 along pretty good, but I'm having problems.  I

18 don't have an office to work out of to do my

19 duties."  He patted his neck and walked away and

20 said, "Well, don't rush back."

21     Q    Had you not come back to work yet?

68

1    A   I was trying to come back.  I had come

2  back in that day, that morning.  I was in civilian

3  clothes, soft collar, because I was on restricted

4  duty.

5    Q   And that's what he said to you?

6    A   He just walked away and said, "Well,

7  don't rush back," and walk away from me.

8    Q   Did you talk to him about finding an

9  office?

10    A   No, sir.

11    Q   Did you talk to the warden about finding

12  an office?

13    A   I asked the warden what I was supposed

14  to do for furniture.  I asked him --

15    Q   Did you ask him about an office, though?

16    A   A few times.

17    Q   You did?

18    A   Yes, sir.

19    Q   So you did talk to the warden about

20  finding an office?

21    A   I told him I was having problems, I

69

1  didn't know where to go, and he was talking about

2  moving, "Well, maybe you can move Sergeant Royster

3  out."  And I said, "Well, no, I'm not going to

4  displace other people because I'm displaced."

5      Q    Okay.  Do you recall when that

6  conversation was?

7      A    It was all around that time frame, that

8  day that I came back in October of 2001, whatever

9  day that was that I came back to work.

10     Q    Now, you say you came back one day in

11  October 2001.  Did you then come back the next day

12  and the next day or did you just come back one

13  day?

14     A    No, sir, I came back.

15     Q    And you stayed?

16     A    Yes, sir.  Once I was cleared to come

17  back to work I came back, and I asked Lieutenant

18  Brown to share an office with me, and then I

19  moved.

20     Q    Did you talk to Colonel Keefer about

21  finding another office?

70

1   A   No, sir.

2   Q   All right.  "My position as commander of

3   special operations was eliminated."  When did this

4   happen?

5   A   January 15th of 2002, I believe.  That's

6   the date.

7   Q   What happened there?

8   A   I was told by the warden in the morning

9   briefing to be at a meeting at 2:00 with Colonel

10  Keefer, Major Tuvin and I.  I said okay.  And when

11  I showed up for the meeting at 2:00, he told me

12  that I had been reassigned to work permanent 4:00

13  in the evening until 12:00 at night -- actually,

14  3:00 in the afternoon until 11:30 at night, Monday

15  through Friday working in the jail, that I no

16  longer would be assigned as commander of special

17  operations, I would no longer be doing training, I

18  would no longer be doing anything like that.  The

19  only thing I would continue to do, they had just

20  recently given me internal investigations to do,

21  the first of the year in January.

71

1    Q    Did you not do the cultural diversity

2  training any more?

3    A    He told me that after I was done that I

4  would not be doing anything with training.

5    Q    So you stopped doing that?

6    A    Well, this was going to take affect

7  February 1st, but once the cultural -- once I was

8  done teaching the cultural diversity, because I

9  said, "What about the cultural diversity?"  He

10  said, "Well, you finish that out.  You do that,

11  but you will not be responsible" -- I had been in

12  charge of training since 1986.

13    Q    All right.

14    A    And he said, "You won't be doing

15  anything with training."

16    Q    So what were your new duties?

17    A    I had no idea.  I had asked the warden

18  what my new duties were going to be, and he said,

19  "You're going to be working in the back in the

20  jail, similar to what Major Turvin is doing right

21  now, except on 3:00 to 11:30 shift."

72

1        I said, "Okay. Can you get with me and

2  let me know exactly what that is?"

3        He said, "I will do that before

4  February 1st."

5    Q   Okay. And?

6    A   He never did. February 1st came, I

7  worked one day of my new duty assignment where I

8  sat down in my old office, boxed everything up,

9  and that was the last day I worked there.

10   Q   February 1st was your last day?

11   A   February 1st was the last day I

12  physically worked. I took personal leave. It was

13  a Friday. I was off Saturday and Sunday. I took

14  personal leave Monday, Tuesday and Wednesday, and

15  resigned.

16   Q   Okay. Now, had you requested, prior to

17  that, any kind of scheduling changes?

18   A   Yes, I did.

19   Q   What were those?

20   A   Because they knew I was going to night

21  school, trying to get my master's, working on my

73

1  master's degree.  And I explain to them that by

2  doing this shift, you know, putting me on 3:00 to

3  11:00, it would mess up the night school which I

4  had already paid for.  My wife had already -- I

5  had worked primarily Monday through Friday day

6  work, and while I know that that can be changed

7  any time, I said, you know, if I would have had

8  some previous notice that this was going to happen

9  instead of January 15th happening February 1st, we

10  wouldn't have arranged our lives the way that we

11  did.

12     Q   Okay.

13     A   My wife had enrolled in school up at

14  Western Maryland College to get her master's in

15  teaching.  We invested about $3,000.  So I asked

16  could I work Friday, Saturday and -- I'm sorry,

17  let me back up.  And with my two children who were

18  ages -- well, they are three and six.  Back then

19  they were two and five.  I said, you know, "We'll

20  have babysitting problems, we'll have some issues

21  there."  I said, "Could I work Friday, Saturday,

74

1  Sunday and Monday ten hours?"  Still not knowing

2  what my duties were, but I was willing to do that.

3  And I said, "And then I can have off Tuesday,

4  Wednesday and Thursday, and that way my wife can

5  go to school.  My wife can go to school, and we

6  can work the babysitting situation out."  And the

7  warden told me, no, he couldn't accommodate that.

8     Q   Okay.  Could they accommodate you in any

9  other way?

10    A   He did not tell me of any other way he

11  could accommodate me.

12    Q   What was your scheduling, your new

13  schedule February 1st?

14    A   Monday through Friday working 3:00 p.m.

15  to 11:30 p.m.

16    Q   When were your classes?

17    A   Tuesday.

18    Q   Just Tuesday?

19    A   I had class on Tuesday evening, my wife

20  had class on Wednesday and Thursday evening.

21    Q   Tuesday from when to when?

75

1    A    Oh, gosh.  5:30 to 8:15.

2    Q    Okay.  And so your testimony is that

3  there was no way that you could make your class

4  and come to work and work at the sheriff's office?

5    A    I didn't say that.  That's not how I

6  would say that.

7    Q    How would you say it?

8    A    I would say it would cause quite a

9  hardship on our family the way we had structured

10  everything if I would have been made to work 3:00

11  to 11:30 with the way that we set up us going to

12  school and with the children and everything.

13    Q    All right.  I don't want to act too

14  confused, but did they say your schedule would be

15  3:00 to 11:30?

16    A    3:00 to 11:30.

17    Q    No matter what?

18    A    That's what the warden told me.

19    Q    They didn't offer you any other

20  alternative to that?

21    A    He did not.

76

1    Q    Anything where you could accommodate

2  going to school?

3    A    He told me I can take annual leave.  He

4  said, "Well, you can always take annual leave.  He

5  said, "You can take annual leave and take off,"

6  but he said all leave must be approved through

7  him.

8    Q    There was no accommodation to let you

9  work weekends and take Tuesday off?

10    A    Not that he told me.

11    Q    Did you ask?

12    A    Yes, I did.  I said, "Can I work Friday

13  Saturday, Sunday and Monday, ten hour shifts?"  He

14  said no.

15    Q    Did you have any other offers for him to

16  choose from?

17    A    No, sir.

18    Q    You just asked for that?

19    A    I asked for that.

20    Q    What did you want to work, on Friday,

21  Saturday, Sunday and Monday what hours?

77

1    A    Ten-hour days.

2    Q    From when to when?

3    A    I told him I would work from 2:00 in the

4  afternoon to midnight.

5    Q    2:00 to midnight?

6    A    Right.

7    Q    Okay.  So you had an offer, they had an

8  offer, and that was it, they offered you 3:00 to

9  11:30, and you offered them 2:00 to midnight, four

10  days a week?

11    A    Correct.

12    Q    I just want to get it straight.

13    A    Correct.

14    Q    Okay.  And you say you don't know what

15  your new position entailed?

16    A    No, sir.

17    Q    And what effort did you make to find out

18  what the new position entailed?

19    A    I asked the warden in the morning

20  briefing.  Major Turvin was there.

21    Q    Uh-huh.

78

1    A    "Can we get together so you can go over

2  my new duties, what's expected of me?"

3    Q    Okay.

4    A    This was prior to February 1st.

5    Q    Uh-huh.

6    A    I think it was actually on January 31st.

7  And he said, "I'll get with you, yes.  We'll meet

8  later."

9    Q    Okay.

10    A    And he never did.

11    Q    Did he refuse to meet with you?

12    A    He never met with me.  He did not

13  refuse, but he never met with me.

14    Q    And did somebody have this job before

15  you?

16    A    No, sir.

17    Q    So this was a newly created position?

18    A    Just the captain.  I was the only

19  captain in the whole Carroll County Sheriff's

20  office, and I asked the warden that in Major

21  Truvin's presence.  I said, "This is a captain's

79

1  position, this is not a first lieutenant's

2  position or a sergeant's position, you're telling

3  me this is a captain's position?"

4        And he stated, "That's correct, it is a

5  captain's position."

6     Q   I believe you said you'd be doing

7  internal affairs?

8     A   Yes, sir, under this new position, yes,

9  sir.

10    Q   So you were aware you would be doing

11  internal investigations?

12    A   Well, they assigned me that in January

13  or December.  They had me doing some

14  investigations.  And what he did was he told me

15  while I will not have any other responsibilities

16  that I had as the commander of special operations,

17  the one thing that I would continue to do would be

18  internal investigations.

19    Q   Were there any other duties that they

20  did tell you you would continue to be doing?

21    A   No.

80

1    Q    Just internal investigations?

2    A    Yes, sir.

3    Q    Was there any change in your pay or

4 benefits as a result of this?

5    A    No, sir.

6    Q    Did you complain about your new position

7 to anyone?

8    A    My wife.

9    Q    Anyone else in the sheriff's office or

10 in the Carroll County government?

11    A    No, sir.  Major Turvin, he knew.

12    Q    So there's nothing in writing?

13    A    There's nothing in writing.  I'm sorry.

14 Yes, if I could, I did complain to the warden

15 about it, I did.  I explained to him that he had

16 just upset my complete world.  I said, "And I

17 understood that I'm not guaranteed certain hours,"

18 I said, "but you have taken my world that I have

19 known it for the last 15 years and turned it

20 completely upside down.  This is the way my wife

21 and I planned our lives, and you have messed with

81

1  that."  So I did complain to him.

2       And his response was, "It's a newly

3  created position.  I need you in the jail."

4    Q   Did he say that you would be like acting

5  warden of the jail at any time?

6    A   Oh, no, sir.

7    Q   Or that you would be in charge of the

8  jail?

9    A   No, sir.  As a matter of fact, when he

10  told me in the first meeting, he said, "Your

11  duties will be similar to what Major Turvin's

12  doing."

13       I said, "Well, then am I going to get

14  promoted to major?"

15       And Colonel Keefer just laughed and

16  said, "It's a tough budget time.  That's not going

17  to happen."

18    Q   You had written in your letter

19  "underhanded tactics."  What were you referring to

20  by that, "I would be a hypocrite if I allowed

21  these underhanded tactics which you have

82

1 endorsed."

2     A    Well, I think that the sheriff signed

3 off on the change, my reassignment, he signed off

4 on it.  He knew I was upset by it.

5     Q    How did he know that?

6     A    He came in my office prior to

7 February 1st and Sergeant Royster and Lieutenant

8 Brown were sitting there and he ask me who I was

9 going to pick in the Super Bowl.  And I told him I

10 didn't really care who won the Super Bowl, I was

11 trying to figure out what I was going to do with

12 my life since I've been reassigned.  And he turned

13 around and said, "Well, Mark, I'm available."

14     Q    Okay.

15     A    And I said, "Yeah, so am I."

16          He went to Sergeant Royster and told

17 Sergeant Royster that if I had a concern with the

18 duties that maybe I should come talk to him.

19     Q    To the sheriff?

20     A    Yes.

21     Q    Okay.

83

1     A    But the sheriff never called me.  And

2  being the sheriff, all he has to do is pick the

3  phone up, we need to discuss this, not go through

4  a lower ranking individual.

5     Q    Okay.  Anything else that you would

6  describe as "underhanded tactics"?

7     A    I can't think of anything.

8     Q    And you write, "I would be a hypocrite

9  if I allowed these underhanded tactics, which you

10  have endorsed, to dissuade me from supporting

11  Lieutenant Salvertore Brown and his efforts to rid

12  the detention center of its racists attitudes."

13  Why did you say that, conclude that these tactics

14  were to dissuade you from supporting Mr. Brown?

15     A    I believe that they were targeting me,

16  moving me out of my office.  It was almost like a

17  progressive discipline against me.  First you're

18  out of your office, then we're reassigning you,

19  then we're putting you on a shift where no one

20  will see you, out of sight, out of mind, you won't

21  be around Lieutenant Brown.  And I think, I felt

84

1  as though they were targeting me in a way to try

2  to break me of my support for Lieutenant Brown and

3  all the other attitudes that I felt that they

4  displayed.

5      Q    Okay.  Now, we talked about your

6  appointment as the cultural diversity trainer and

7  we talked about how long you'd been in that

8  position.  You wrote "I have endeavored to ensure

9  equal treatment at the detention center."  Other

10  than the training which you already described and

11  the comments and the complaints that you made,

12  were there any other efforts that you made to

13  ensure equal treatment of the detention center?

14      A    Throughout my career I treated people as

15  fairly as I possibly could to the best of my

16  ability.  I would talk to people if they had

17  problems.  I would take the time to discuss their

18  issues with them.  That was the way I handled

19  myself.

20      Q    Okay.  And you wrote that "Management's

21  support for these efforts has proven to be a

85

1 farce."  What did you mean by that?

2    A   Every time they would call me in and ask

3 me, "Do you think there's racial problems?"  And I

4 said, "Yes, I think there are some issues here."

5 I mentioned earlier they would dismiss it.  They

6 would not acknowledge it.  They wanted to hear

7 what they wanted to hear.  And I felt as though

8 they were going to continue to ask me, you know,

9 until they got the response that they wanted to

10 hear, and I would not give them that.

11    Q   Okay.  All right.  Did I already give

12 you 45?

13    A   You gave me 44.

14    Q   Oh, that's your letter of resignation?

15    A   Yes, sir.

16    Q   I don't know if I made you a copy of

17 that or not.  Oh, yeah, I did.

18    A   Okay.

19    Q   45.

20    A   Yes, sir.

21    Q   Okay.  And you want to just identify

86

1  that for me for the record.

2     A    It's a letter I provided to Lieutenant

3  Brown --

4     Q    Uh-huh.

5     A    -- about the comments that I overheard

6  Sheriff Tregoning say in reference to

7  African-Americans.

8     Q    Okay.  What was your relationship with

9  Salvertore Brown; how would you describe it?

10    A    Professional.

11    Q    You weren't friends?

12    A    Define friends.

13    Q    Did you have a social relationship?

14    A    Not really, no, sir.

15    Q    No interaction outside the office?

16    A    I wouldn't say no interaction outside,

17 but, you know, very, very little.  He stopped over

18 the house a couple times.  We would discuss work.

19    Q    Were you his supervisor?

20    A    I was.

21    Q    Had you received any complaints about

87

1 Mr. Brown from anyone while you were his

2 supervisor?

3    A   Throughout his career?

4    Q   Yes.

5    A   Yes, sir.

6    Q   And complaints from whom?

7    A   I investigated one complaint that was

8 forwarded to me, and I'm not sure of the date, but

9 it had to do with the Maryland State Police.

10 Lieutenant Brown was the shift supervisor, and the

11 sheriff got a complaint from the State Police

12 because Lieutenant Brown made a decision that did

13 not suit them, so it was forward to me to

14 investigate it, and I investigated that complaint.

15    Q   Okay.  And was that the complaint made

16 by somebody named Tanzola?

17    A   Yes, sir, that's it, Tanzola.

18    Q   I'm going to show you what I marked as

19 103 and 104.

20    A   Okay.

21    Q   Do you recognize that?

88

1    A   Yes, sir.

2    Q   Okay.  And is that an evaluation of

3  Mr. Brown's performance as it relates to that

4  complaint?

5    A   Yes, it is.

6    Q   What is the date on that complaint?

7    A   February 15th, 2001.

8    Q   Okay.

9    A   Well, that's the day that I did this

10  report, completed this report.  The date of the

11  complaint looks like it was January 14th, 2001.

12    Q   Okay.  All right.  Did you ever have

13  any -- were any complaints of excessive force

14  about Mr. -- I'm sorry, strike that.

15       Did you have any cause to investigate

16  any complaints of excessive force that were

17  leveled against Mr. Brown?

18    A   I did not.  I did not, not that I can

19  remember.

20    Q   Okay.  Any other complaints about

21  Mr. Brown?

89

1    A   That I investigated?

2    Q   That were made to you?

3    A   I don't believe so.

4    Q   Okay.  Either from the sheriff or Warden

5  Hardinger?

6    A   No, sir, not that I can remember.

7    Q   All right.  Let me show you what I

8  marked as No. 40.  Do you recognize that?

9    A   No, sir, I don't recognize this, but I

10  understand what it says.

11    Q   What is it about?

12    A   It looks like it's a personal order for

13  transfer of duties.

14    Q   Were you affected by this order?

15    A   I had resigned.  This is dated

16  February 27th.  I was no longer employed with the

17  agency.

18    Q   Okay.  All right.  Just hang on to that.

19  I want to ask you about -- do you recognize this

20  document at all?

21    A   Looks like when I was promoted to

90

1  captain.

2     Q   Okay.  And that's what?

3     A   Dated April 19th, effective April 27th,

4  the year 2000.

5     Q   I want to ask you if you recognize this

6  document which I have marked as 2 of 3.  You may

7  want to read that.

8     A   Okay.

9     Q   Do you recognize that document?

10    A   No, sir.

11    Q   You've never seen that before?

12    A   I don't believe I have, no, sir.

13    Q   Are you familiar at all with what's

14  described in that document, that incident?

15    A   I'm not familiar with the incident.  I'm

16  familiar with these type of incidents.

17    Q   But not that particular one?

18    A   Not this particular incident, no, sir.

19    Q   I just want to make sure.

20        Okay.  I want to show you what I've

21  marked as No. 47 and 48.  I apologize for the --

91

1     A    Oh, my.

2     Q    -- tiny writing.  But if you could take

3  a few minutes to look at that and see if you're

4  familiar with the incident that's described in

5  that particular document.

6     A    Okay.

7     Q    Are you familiar at all with that?

8     A    No, sir, not at all.

9     Q    Not involved in that incident at all?

10     A    No, sir.

11     Q    You weren't charged with investigating

12  it or anything?

13     A    No, I wasn't.

14     Q    Now, were you Mr. Brown's supervisor in

15  August or September of 2001?

16     A    August and September of 2001?

17     Q    Yes.

18     A    Yes, I was, but I wasn't there.  I was

19  on medical leave.

20     Q    Who was his supervisor?

21     A    I would imagine he went to Major Turvin

92

1  at that point.

2     Q    Okay.  And do you remember, when did you

3  say you went out on medical leave, in July?

4     A    July 2001 until October.

5     Q    Until October?

6     A    Yes, sir.

7     Q    Were you aware if Mr. Brown was engaged

8  in any kind of a relationship with any subordinate

9  officers?

10    A    No, sir.

11    Q    All right.  Did you supervise a Leena

12 Welty?

13    A    No, sir.

14    Q    Okay.  Now, when you were Mr. Brown's

15 supervisor, did you evaluate him?

16    A    I did not have the chance to evaluate

17 him.

18    Q    Why not?

19    A    If I would have stayed there, I would

20 have.  He was moved downstairs into special

21 operations while I was out on medical leave.

93

1    Q    Uh-huh.

2    A    So when I came back, if I had remained

3  there, I would have eventually evaluated him.

4    Q    You didn't do any evaluations on him at

5  all?

6    A    No, sir.

7    Q    I may have asked the question already,

8  but you weren't instructed on how to evaluate him

9  by anyone?

10    A    I knew how to you evaluate individuals,

11  yes.

12    Q    Was there a scheduled evaluation that

13  you were going to do?

14    A    Yes.

15    Q    When was that?

16    A    In January.

17    Q    How come it wasn't done?

18    A    Because I was getting ready to leave.

19    Q    Was the evaluation due at some point?

20    A    It was due, I'm not sure what the policy

21  states, I think sometime in February.

94

1    Q    Okay.  And you didn't begin his

2  evaluation at all?

3    A    I did.  I had documentation on, you

4  know, things that Lieutenant Brown had done.

5    Q    Do you know where that documentation is?

6    A    I left it in his file back at the office

7  when he left.  It stayed.

8    Q    Okay.

9    A    And it was documentation, you know,

10  about his appearance, you know, because the

11  evaluation, you had to document good things as

12  well as bad.

13    Q    Were you ever told to take any

14  particular action against Lieutenant Brown?

15    A    No, sir.

16    Q    Okay.  What is your opinion of

17  Lieutenant Brown's style of treating inmates at

18  the detention center based on your role as his

19  supervisor?

20    A    I think Lieutenant Brown's extremely

21  firm, very, very fair.  He supports his officers

95

1  and his staff 100 percent.  He will not allow an

2  inmate to disrespect staff or anyone in the

3  agency.

4      Q    Would you describe him as rigid?

5          MR. SHOEMAKER:  Objection.

6          You can answer that.

7          THE WITNESS:  I'm sorry?

8          BY MR. MANN:

9      Q    Would you describe him as rigid?

10     A    Define rigid.

11     Q    Did he ever deviate from any policies in

12  handling inmates?

13     A    I wouldn't word it like that.

14     Q    How would you word it?

15     A    Lieutenant Brown was very

16  policy-and-procedure oriented.  He knew the

17  policies and procedures and he followed those

18  well.

19     Q    Did you ever know him to deviate from

20  any policy?

21     A    I did not.

96

1    Q   Okay.  Now, when you say Lieutenant

2   Brown supported his officers 100 percent, did he

3   support other officers not on his shift?

4    A   That's what I saw.  I believe he did,

5   yes.  I know of one incident where someone from a

6   different shift came to Lieutenant Brown to make a

7   complaint about the way inmates were treating her

8   because she knew that the supervisor on her shift

9   wouldn't do anything.  Lieutenant Brown went back

10  and asked the housing unit, you know, who was

11  responsible for making the comments to the female

12  officer, and when he couldn't find out who it was,

13  he said, "If no one is going to step up and tell

14  me what individual did it, everybody will get

15  locked down."  And he showed support for that

16  staff person in saying you're not going to

17  disrespect our staff here, our officers.  We're

18  here for a purpose.  We're here for a job, not to

19  be disrespected.  So in that sense, I do believe

20  that other staff respected Lieutenant Brown and

21  would go to him for help.

97

1    Q    So in this situation everyone was locked

2  down until they --

3    A    I believe they were.

4    Q    Until they determined who the culprit

5  was?

6    A    I believe they were locked down until

7  someone of higher rank let them out, because they,

8  I don't think they ever did determine who the

9  culprit was.

10    Q    Did you notice any difference between

11  Mr. Brown's philosophy of treating inmates and the

12  warden's?

13    A    Yes, sir.

14    Q    What way?

15    A    The warden doesn't understand

16  corrections.

17    Q    Why not?  Why do you say that?

18    A    He would go back and try to make deals

19  with the inmates.

20    Q    Uh-huh.

21    A    He would allow the inmates to tell him

98

1  one thing, even though they laughed behind his

2  back afterwards.  His experience as a correctional

3  officer was minimal.

4      Q   Were you aware that Lieutenant Brown

5  disagreed with Warden Hardinger's philosophy in

6  treating inmates?

7      A  We all disagreed with Warden Hardinger's

8  philosophy.

9      Q   Were you aware that Lieutenant Brown

10  disagreed?

11      A   Yes.

12      Q   Were there any problems between

13  Lieutenant Brown's shift and the officers on his

14  shift and officers on other shifts?

15      A   I wouldn't say that there were problems.

16  There are differences that the shifts have.  Each

17  individual runs -- the supervisors run their

18  shifts differently, and the people on that shift

19  take on the nature of that shift supervisor.

20  Consequently, since you have different

21  personalities, you have differences in the shifts.

99

1    Q   Okay.  Were there any complaints, other

2  than the ones we've already talked about.  Did

3  Lieutenant Brown make any complaints to you about

4  the warden?

5    A   I don't believe so.

6    Q   Okay.  Did he make any complaints about

7  the sheriff to you?

8    A   He was upset that the sheriff did not do

9  anything about this incident.  The one incident

10  where he went to the sheriff, I believe something

11  was done.  The sheriff had a meeting with the

12  warden and Lieutenant Brown and said it would

13  never happen again, and then sometime later, I'm

14  not sure of the time frame, three, four, five

15  months.  I'm not sure.

16    Q   Did Lieutenant Brown talk to you about

17  that meeting between Warden Hardinger and the

18  sheriff?

19    A   He didn't tell me specifically what took

20  place.  He let me know that there was a meeting

21  and it was resolved, he thought.

100

1   Q   Lieutenant Brown thought it was

2   resolved?

3   A   He thought it was resolved.

4   Q   Why did he think it was resolved?

5   A   I don't know that.

6   Q   This was regarding the racial remark?

7   A   Yes, sir.  But then sometime a few

8   months later when Warden Hardinger went over and

9   berated Lieutenant Brown in front of his shift and

10   in front of other staff, and I know that there was

11   a meeting with --

12   Q   Were you present during that?

13   A   I was not.  I was not.  Everybody just

14   was talking about it.

15   Q   All right.

16   A   And that's the information I got through

17   others talking about it.

18   Q   Other than the conversation you had with

19   Kim Millender regarding the comment, the racist

20   comment by Warden Hardinger, did you ever meet

21   with Kim Millender at any other time?

101

1    A    Not about this.

2    Q    Did you talk to her about other things?

3    A    Yes, I had to meet with her for

4  something else, and I don't remember what it was.

5  It may have been the Tanzola investigation, but

6  I'm not sure if I met with her on that or not.  I

7  think maybe after the investigation I forwarded

8  that to her for her review.

9    Q    All right.  Okay.  I want to -- I have

10  not marked this, so we're going to enter this as a

11  new exhibit.  This is a newspaper article.

12    A    Yes, sir.

13    Q    I just want to ask you about a few

14  comments in this article.  Some of them we've

15  already gone over.

16        On I think it is page 2 up at the top

17  left-hand corner, it says here "That deputy was

18  ordered to write a 500-page report about why

19  staying away is important."  Did you make that

20  statement?

21    A    Yes, I did.

102

1    Q    And who was that deputy?

2    A    His last name was Meyers, I think

3 Jeffery Meyers.

4    Q    Okay.  And what is your -- did you have

5 direct knowledge of this?

6    A    The warden told us that that's what they

7 were going to do to him, disciplinary.

8    Q    Uh-huh.

9    A    I don't know if it was exactly a

10 500-page report.  And I said that to the

11 newspaper, "Ddon't hold me accountable for a

12 500-word report."  But it was a report, and there

13 was a figure put on it like a 500-word report.

14    Q    500 words, not 500 pages?

15    A    Oh, my gosh, no.

16    Q    Because it says in here 500-pages.

17    A    That's a dissertation.  No, I never said

18 500 pages.

19    Q    Well, this is a comment that Warden

20 Hardinger told you?

21    A    In the briefing other people were

103

1  present.

2     Q    Were you present?

3     A    I was.

4     Q    That that's what they were doing to

5  Jeffery Meyers?

6     A    That that's what they were doing to him.

7     Q    Were you aware if they did that or not?

8     A    I do not know.

9     Q    Okay.  Did you make any other inquiries

10  about Jeffery Meyers as to what was going to

11  happen to him?

12     A    Oh, no, no.

13     Q    I want to go -- let's move over to the

14  next column of that article.  It says on the

15  second real paragraph, "Peregoy said the warden

16  yelled at Brown in front of other employees while

17  telling white employees in private."  Did you make

18  that comment?

19     A    I did.

20     Q    And that's based on what?

21     A    I know that the warden was talking to

104

1  all the lieutenants he stated.  He even came into

2  my office that day, and Darlene Smith was present,

3  and he started saying, "I'm going to chew some ass

4  here today."

5      Q    Uh-huh.

6      A    And, "I'm tired of what's going on

7  here."  And he went off on a little bit of a

8  tirade, and Darlene and I just looked at each

9  other and said okay.

10     Q    Did you see the warden yelling at

11 Mr. Brown?

12     A    I did not.  I know that he did it, from

13 what other people said, in front of the shift.

14 Then he contacted Lieutenant Ron Bollinger, and

15 Lieutenant Ron Bollinger actually went to the

16 warden's house where he allegedly spoke to him

17 about concerns.

18     Q    On what did you base that statement?

19     A    Ron Bollinger told us.

20     Q    Ron Bollinger told you that he went to

21 the warden's house?

105

1    A    That the warden said, "Stop by my house,

2    you know, so I can talk to you," and Ron Bollinger

3    did.  That's what Ron Bollinger told me.

4    Q    This was coming from Ron Bollinger?

5    A    Correct.

6    Q    Now, you wrote, also -- let's see,

7    that's the first paragraph.  Let's look at the

8    fourth paragraph, "County Attorney Kim Millender

9    investigated the matter, determining that the

10   warden made a racist comment but that it was not

11   discriminatory in nature."  And you base this on

12   what?

13   A    Her report.

14   Q    You made this comment, right?

15   A    I made that comment.

16   Q    Okay.

17   A    It was based on her report.  She filed a

18   report, sent it to Sheriff Tregoning and said that

19   there were some issues, but she did not think this

20   was discriminatory in nature.

21   Q    You based it on something you read?

106

1    A    Based off what she wrote.

2    Q    And you wrote in the next paragraph or

3    it says in the next paragraph you found your

4    office had been given to a clerk?

5    A    Correct.

6    Q    Who was that?

7    A    Jamie Conn.

8    Q    Do you know how to you spell that?

9    A    C-O-N-N.

10    Q    C-O-N-N?

11    A    Yes, I believe, yes.  She was

12    maintaining records.

13    Q    Okay.  Now, at the top of the third

14    column, "Chief Deputy Robert Keefer, also white,

15    disputed those allegations, saying he, Hardinger

16    and Peregoy met for nearly 45 minutes to discuss

17    what Peregoy's new job duties would be."  Was

18    there a meeting?

19    A    That was that meeting on January the

20    15th where Colonel Keefer was there, Major Turvin

21    was there, I was there and the warden was there.

107

1 And we did meet for maybe 45 minutes would be,

2 that's close.

3     Q   Was there any discussion of what your

4 new duties would be?

5     A   It's similar to what Major Turvin's

6 duties are going to be.  That was the discussion.

7     Q   Okay.  Was Major Turvin going into

8 another position?

9     A   No, sir.

10     Q   But he didn't work 3:00 to 11:00, did

11 he?

12     A   No.  I was going to share -- they told

13 me I would share his office, that when he left it

14 I could go ahead and sit behind his desk.

15     Q   All right.  I think we've already talked

16 about the rest of this.

17         Go to the fourth column at the top,

18 "After a group of officers interviewed several job

19 candidates, one of the officers said one of the

20 candidates 'would make a good officer for a

21 minority.'"  Is that a statement you made?

108

1   A   Yes, sir.

2   Q   What was that about?

3   A   I sat on an interview board along with

4   Steve Reynolds, who is now in my position as

5   captain, but he was director of support services

6   at the time.  And after we interviewed people, we

7   would brief the sheriff on these individuals.  And

8   there was one individual, his name was Jason

9   Backus.  Jason Backus has a bachelor's degree,

10  working on his master's degree.  He was a school

11  teacher down in Baltimore City with troubled

12  children.  His qualifications were just fantastic.

13  And he had applied for a job.  And Steve Reynolds

14  and I were sitting there briefing the sheriff, and

15  Colonel Keefer was in this meeting as well, and

16  Steve Reynolds came out and said, "He'd make a

17  good officer for a minority."  And I said, "He'd

18  make a good officer as a human being."  And there

19  was dead silence.  There was dead silence in the

20  room.

21  Q   Did anyone else witness this?

109

1    A   Sheriff Tregoning, Colonel Keefer, Steve

2  Reynolds.

3    Q   Did you report this to anyone?

4    A   No, sir.

5    Q   All right.  Do you know, are you

6  familiar with somebody by the name of Chuck

7  Paulson?

8    A   I am.

9    Q   Is, to your knowledge, Chuck Paulson

10  running for sheriff?

11    A   Would you like one of his cards?

12       MR. MANN:  Just for the record, the

13  witness has pulled out a "Vote for Chuck Paulson."

14       THE WITNESS:  Chuck Paulson is running

15  for sheriff.

16       BY MR. MANN:

17    Q   Charles "Chuck" Paulson, I guess they

18  are business cards?

19    A   They are business cards.

20    Q   Are you involved in his campaign?

21    A   I am.

110

1      MR. SHOEMAKER:  Objection.

2      BY MR. MANN:

3      Q   In what capacity are you involved in his

4  campaign?

5      A   My wife is his treasurer, and I'm very

6  supportive of his efforts to become the next

7  sheriff.

8      Q   Okay.  Have you discussed what your --

9  let me put it this way.  Did you discuss with

10  Mr. Paulson if he becomes sheriff whether you'll

11  have a role in the Carroll County Sheriff's

12  Office?

13      A   I would not take a role in the Carroll

14  County Sheriff's Office.

15      Q   Have you had discussions with him about

16  any future role you might have with the Carroll

17  County Sheriff's office?

18      A   No, sir.  My days at the sheriff's

19  office are over.

20      Q   Are you paid to work on his campaign?

21      MR. SHOEMAKER:  Objection.  Just for the

111

1  record, objection.

2      THE WITNESS:  No, sir.

3      MR. SHOEMAKER:  Go ahead and answer.

4      THE WITNESS:  No sir.

5      BY MR. MANN:

6  Q   Does your wife receive any funds?

7  A   No, sir.

8  Q   All right.  Have you had any discussions

9  with Chuck Paulson about this case, Salvertore

10 Brown versus Kenneth Tregoning?

11 A   Yes, sir.

12 Q   What was the nature of those

13 conversations?

14 A   That it is a pending discrimination suit

15 going on and it will be interesting to see what

16 the outcome is.

17 Q   What do you mean it will be interesting

18 to see?

19 A   He's an elected official.  It's just I

20 think this is deplorable what's going on and that

21 it's gone on so long.  And I just think it's going

112

1 to be very interesting to see what the outcome

2 will be of this case.

3    Q    Any other discussion you've had with him

4 about this lawsuit?

5    A    In what respect?

6    Q    In any respect?

7    A    We talked about the case.  We talked

8 about the lawsuit, but I don't -- I'm not real

9 familiar with all the specifics with what your job

10 is, what Mr. Shoemaker's job is, what you're

11 doing, what you've decided, so no.

12    Q    Have you provided Mr. Paulson any

13 information about the lawsuit?

14    A    He knows that, you know, Lieutenant

15 Brown has made, you know, filed a lawsuit and that

16 I'm supportive of Lieutenant Brown with this

17 lawsuit.

18    Q    Uh-huh.

19    A    Chuck Paulson knows a lot about the

20 lawsuit just by what's in the paper, what's been

21 in the paper.  Have we talked about that?  Yes, we

113

1 have.  We've talked about this article.  We've

2 talked about the article that was in -- that

3 Lieutenant Brown submitted to the paper.  We've

4 discussed all of that.

5     Q    Now, actually, let me ask you a question

6 about this article.  This article appears to be

7 dated, somebody wrote this at the top, April 2nd,

8 2002.  Does that sound like the correct date of

9 the article?

10     A    Yes.

11     Q    How did you come to be quoted in this

12 article?

13     A    I was interviewed.

14     Q    Did you call the reporter or did the

15 reporter call you?

16     A    I dropped off a letter to the editor

17 that was approximately two paragraphs long.

18     Q    Uh-huh.

19     A    And I received a phone call from the

20 reporter who said that they would like to do an

21 in-depth interview.

114

1    Q    Do you have a copy of that letter?

2    A    Not with me, no, sir.

3    Q    Do you have a copy at home?

4    A    I do.

5    Q    Can you make a copy of that available to

6  me?

7    A    Why?

8    Q    Is it not responsive to the subpoena

9  request?

10    A    No, it's not.  I don't think so.

11    Q    It doesn't have anything to do with any

12  charges of race discrimination?

13    A    I'll run that by my attorney and let him

14  get with you.

15    Q    Who is your attorney?

16    A    I'll get with you on that as well.

17    Q    Are you refusing to answer?

18    A    I am.

19    Q    Okay.  Have you filed a complaint

20  against Sheriff Tregoning?

21    A    With who?

115

1    Q    With anyone?

2    A    I have filed with EEOC, yes.

3    Q    You have?

4    A    I have.

5    Q    When did you file that complaint?

6    A    March.

7    Q    Of 2002?

8    A    Yes, sir.

9    Q    Okay.  And what was the basis of that

10   complaint?

11       A    That I was retaliated against for my

12   support of Lieutenant Brown.

13       Q    Uh-huh, did you file any other

14   complaints?

15       A    No, sir.

16       Q    You haven't filed a complaint with the

17   county attorney of Carroll County?

18       A    No, sir.

19       Q    Or Carroll County government?

20       A    No, sir.  I sent them a notice.

21       Q    You filed a claim?

116

1     A   I sent them a letter saying that, you

2  know, I was planning on suing them.

3     Q   A notice of claim?

4     A   Notice of claim.

5     Q   And did you file a notice of claim with

6  anyone else or send it to anyone else?

7     A   No, sir.

8     Q   To your knowledge, has Lieutenant Brown

9  talked with Chuck Paulson about this case?

10     A   Not to my knowledge.

11     Q   You haven't been present during any

12  conversations?

13     A   No, sir.

14     Q   Have you had any conversations with

15  Chuck Paulson about contacting Lieutenant Brown?

16     A   No, sir.

17     Q   Okay.  I have asked a number of

18  questions about your complaints against the

19  sheriff's office and the reason for your

20  resignation.  Is there anything else that you

21  would like to add before we close this deposition?

117

1    A   I don't believe so, not that I can think

2  of.

3    Q   Okay.  I want to put the document -- can

4  I have these back, please.

5    A   Sure.

6        MR. MANN:  I'd like to submit this

7  article as an exhibit, which is not marked, so I

8  guess we'll call that Exhibit 1, and then the

9  articles in the papers that have been marked 40,

10  103, 104, 45, 44.  And let's make sure it's both

11  your letters.

12    (Peregoy Deposition Exhibit No. 1 identified.)

13      Okay.  That's it.

14      MR. SHOEMAKER:  Nothing.

15      MR. MANN:  Thank you.

16    (The deposition concluded at 10:40 a.m.)

17

18

19

20

21

118

1  State of Maryland

2  Baltimore County

3      I, Cari M. Inkenbrandt, a Notary Public of the

4  State of Maryland, Baltimore County, do hereby

5  certify that the within-named witness personally

6  appeared before me at the time and place herein

7  set out, and after having been first duly sworn by

8  me, according to law, was examined by counsel.

9      I further certify that the examination was

10  recorded stenographically by me and this

11  transcript is a true record of the proceedings.

12      I further certify that I am not of counsel to

13  any of the parties, nor an employee of counsel,

14  nor related to any of the parties, nor in any way

15  interested in the outcome of the action.

16      As witness my hand and seal this 11th day of

17  June 2002.

18

19

20              Cari M. Inkenbrandt, RPR

21              My Commission Expires 7/2/05

119

1               INDEX

2         Deposition of Mark L. Peregoy

3             Monday, June 3, 2002

4

5  EXAMINATION BY:                    PAGE

6  Mr. Mann                      3

7

8  EXHIBIT     DESCRIPTION              PAGE

9  1       Bate-Stamped Documents
            No.'s 40, 103, 104, 45 and 44   117
10

11

12

13

14

15

16

17

18

19

20

21

120

1      ERRATA AND SIGNATURE SHEET

2         I, Mark L. Peregoy, have read the

3    aforegoing and verify the same to be

4    stenographically accurate with the exception of

5    the following changes (if any):

6    Page  Line    Reads            Should Read

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   ( ) I have no corrections.

19

20         _____

21         Signature of Deponent