IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARK L. PEREGUOY | * | |
| Plaintiff | * | |
| v. | * | Civil Action No.:MJG 02 CV 4165 |
| STATE OF MARYLAND, et al. | * | |
| Defendants | | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## AFFIDAVIT OF PLAINTIFF

1. I am over the age of 18 years.

2. I am competent to testify.

3. My following responses are to specific paragraphs of the Affidavit of Sheriff Tregoning (Exhibit 3, Defendant's Motion to Dismiss):

Response to Paragraph 4:

Warden Hardinger informed me on January 15, 2002, that I would be reassigned to a newly created position that was designed for a Captain only. The position would be the Shift Commander working at the jail Monday-Friday 3:00 p.m. – 11:30 p.m. Present at the meeting when Warden Hardinger informed me of the new assignment was Colonel Keefer and Major Turvin. At the time I asked if I had done anything wrong and Warden Hardinger stated "no" this was a newly created position that was needed for the detention center. While I received a general outline, more of a departmental mission statement, I asked Warden Hardinger what my specific duties would be and he stated he would get with me later regarding those duties. On the date that

**EXHIBIT A**

I was of the reassignment I was extremely upset and kept control of my emotions by not saying much because I did not want to be insubordinate. The following day, with Major Turvin present, I talked to the Warden about the reassignment. I informed the Warden that the reassignment was very shocking to me and asked if there was anything we could work out rather than have me start working Monday-Friday 3:00-11:30 p.m. on February 1, 2002? I again asked if I had done anything wrong to be demoted and the Warden stated that I had not done anything wrong and it was not a demotion, it was a newly created position just for a Captain. I asked him if a Lieutenant could fill the newly created position just for a Captain. I asked the Warden if he would wait until June to reassign me to the new hours because two weeks earlier I had paid over a $1,000.00 tuition to the University of Baltimore for classes, which the Warden and Sheriff had signed a tuition reimbursement form for me, and my wife also had just paid over $1,000.00 for tuition for Western Maryland College. The Warden stated that he could not wait until June to start me in the new position. I also proposed to the Warden working Friday, Saturday, Sunday and Monday 2:00 p.m. – 12:00 a.m. in the new assignment. Again, the Warden stated no. On January 16, 2002, I received a Personnel Order signed by the Sheriff with my new assignment. I did not go to the Sheriff with my concerns because I knew from his signature on the order that the order had his blessing. Any grievance that I could have filled would also had to have gone through the Sheriff according to departmental policy and procedure.

       Response to Paragraph 6:

       Sheriff Tregoning states that the change of duties that affected me were to best meet the operational needs to the Sheriff's Office; However, one week after I resigned, a civilian employee and former state trooper Steve Reynolds was promoted to Captain and assigned the same duties that I had prior to the newly created position, "detention center shift commander".

The position that was created and vital to the operation of the detention center according to Sheriff Tregoning has never been filled. In fact, Steve Reynolds was promoted to Major one year after serving as a Captain and performing the same duties that I was performing prior to the February 1st reassignment.

Response to Paragraph 7:

Sheriff Tregoning states that my office was only one in a series of moves made to provide adequate space for all of the department employees. I was one of those department employees and according to the Sheriff the third in command in the detention center, yet I was told by the Warden to "just go and find a place" when I asked him where I was supposed to do my work after being told I was being moved out of my office. Additionally, Sheriff Tregoning walked away from me and told me not to hurry back to work when I expressed my concern about not having an office to work out of. The adequate space for the third in command of the detention center was an office with a sewer pipe running through it.

Response to Paragraph 8:

I was not aware of any plans to expand the detention center's records unit or its relocation. Warden Hardinger did tell me "to go find a place".

Response to Paragraph 9:

I had two choices for relocating my office. The first was to ask Sgt. Royster to move out of his office and have him move in with Lt. Brown so I could take Sgt. Royster's office. The second was for me to move in with Lt. Brown. I would not displace someone else because I was displaced, therefore, I moved in with Lt. Brown.

Response to Paragraph 12:

I asked Colonel Keefer and Warden Hardinger if the new position went along

3

with a promotion and pay raise. I did not ask the question seriously. It was sarcasm on my part.

Response to Paragraph 13:

I supervised 25-30 individuals as Captain of Special Operations. When I was told of the new position, I asked Warden Hardinger if the Lieutenant working the shift was still responsible for the overall operation of the jail and he said "yes". Therefore, while I outranked the Lieutenant on shift, I was not in charge of operating the facility that would still be the responsibility of the shift supervisor.

Response to Paragraph 14:

Sheriff Tregoning stated that he had a concern about my attitude and competence. His concern with my attitude was because I continued to point out Colonel Keefer, Warden Tregoning and Sheriff Tregoning examples of racial tension that I observed. Colonel Keefer would call me into his office and ask me if I thought there were racial problems within the agency and when I said yes, he would dismiss my comment and then dismiss me from his office. I was never counseled or reprimanded in my 20-plus years with the Sheriff's Office. I was never told about any reports written about me not doing my duties when assigned as Captain of Special Operations.

4.   My following response is to the Affidavit of Major E. Stephen Turvin (Exhibits 7, Defendant's Motion to Dismiss):

On January 16, 2002, I met with Warden Hardinger and Major Turvin to discuss the newly created position that I had been assigned. I asked the Warden if he would explain specifically what I was expected to do as far as duties, in the new assignment and he stated he would get with me later regarding those duties. I again asked him in front of Major Turvin on January 31, 2002, about my specific duties and he again stated he would get with me later. I saw

the Warden on two separate occasions later in the day on January 31, 2002 and he never said anything to me. Major Turvin had his duties changed and office relocated before January 15, 2002 by the Warden. At the time of his duties, Major Turvin told me that the Warden told him that while it was not a loss in pay, he could view the change as a demotion. While I did not say much at the initial meeting about the new job assignment, I did inquire about the duties, why I was being reassigned, had I done something wrong and the effects the new position would have on me the next day with the Warden and Major Turvin.

      From the time Lt. Brown filed a complaint against the Sheriff and Warden until I was reassigned, a number of minor incidents occurred over the months. After Sheriff Tregoning referred to African-Americans as "spooks" in front of Major Turvin and me, I decided that I would not remain quiet and just sit back and watch their "good ole boy" antics. Whenever someone would say something with a racial insinuation in front of me I would speak up and the room would become quiet. There were occasions when comments were made in the presence of Sheriff Tregoning, Colonel Keefer and Warden Hardinger categorizing minorities. I spoke up while the command staff started at me and remained quiet. When minority employees were made to not feel welcome in the workplace, I brought it to Sheriff Tregoning, Colonel Keefer and Warden Hardinger's attention. Again, they remained quiet and stared at me. As a result of my position on their racial behavior, they slowly excluded me from their meetings, from specific duties and then logistically relocated me. When that did not stop me from speaking up and after bringing to Colonel Keefer's attention a stereotypical comment Sheriff Tregoning had made about Asians, I was reassigned. Had I not resigned, I am confident that they would have continued target me because they would have continued to exhibit racial behavior and I would have continued to speak out.

5. My following response is to the letter from EEOC investigator, Regina Davis (Exhibit 1, Defendant's Motion to Dismiss):

According to EEOC investigator, Pereguoy failed to cooperate with the investigator by not returning her phone calls.

I attempted to contact Ms. Regina Davis at least 6 different occasions, leaving messages for her to please call me. Other than talking to Ms. Davis one time on the phone I only received one other phone message from her.

6. My following response is to the Affidavit of Kimberly Millender (Exhibits 2 and 6, Defendant's Motion to Dismiss):

I told Ms. Millender that I was not aware of any racial problems at the detention center. At the time of the interview with Ms. Millender, the only problem I saw was with Warden Hardinger, however, Sheriff Tregoning had only been in office for one year. After my interview with Ms. Millender other racial incidents began to take place. During the interview I was very candid with her about the derogatory comment ("good nigger") Warden Hardinger had directed at Lt. Brown. When she asked me what I think should be done about the incident, I told her that I believed Warden Hardinger should be fired. I was quite honest with her regarding my impression of Warden Hardinger, which was not a good impression. I feel strongly that Ms. Millender conveyed my comments about Warden Hardinger to Sheriff Tregoning.

7, My following responses are to the factual allegations set forth in the Defendant's Motion to Dismiss (page references are to State Defendant's Memorandum in Support of the Motion to Dismiss):

A. Warden Hardinger called Pereguoy to inform him of this change and

allowed him to determine which offices he and his subordinates would occupy. (page 5)

Warden Hardinger told me on the phone that when I returned to work from sick leave we would see where I could move.

B. However, following a visit to his doctor, Pereguoy came to the Sheriff's Office to discuss options for a new office and after meeting with the Warden and several subordinates, Pereguoy decided to share an office with Lt. Brown, which placed him closer to his subordinate officers. (p.5)

After my doctor's visit I met with Warden Hardinger and asked him where my new office was going to be and he stated "just go find a place". There were no vacant offices and I would have to move someone out of their office or share an office. At that time I did not know which to do, so I was going home to think about the office situation. As I was in the parking lot between the Sheriff's Office and County Office Building I saw Sheriff Tregoning. He asked me how I was doing and I told him I was doing better, but I did not have an office to work out of. Sheriff Tregoning patted his neck (I was out on sick leave due to neck surgery) and walked away from me. As he was walking away he stated "don't rush back".

C. During this time, a number of other officers were also asked to move out of their offices to provide adequate space for Sheriff Office Employees. (p.5)

Some of these moves were due to me being moved out of the administrative office area and having to find another place to do my work. Other offices had been converted into inmate housing unit because they were vacant conference rooms. The detention Center did not have three classification officers, they only made one. Assistant Warden Turvin had been moved out of his office area and given a new office, and he was not sharing his office with anyone. Warden

Hardinger also told him, at the time of his move, that he was no longer considered the Assistant Warden and his move could be viewed as somewhat of a demotion.

  D. This was done to best meet the operational needs of the Sheriff's Department and to best utilize Pereguoy's twenty years of correctional experience in the training of newly promoted supervisors and junior staff. (p. 6)

Lt. William Thomas had more experience than me. He had been employed by the Sheriff's Office for 22 years.

  E. During the meeting, Pereguoy was informed of his new duties and responsibilities. (p.6)

I asked if the Lieutenant on shift would still be responsible for the over-all operation of the jail and Warden Harding stated yes. I then asked what my specific responsibilities would be and Warden Harding told me that would get back with me regarding those responsibilities. This conversation occurred on January 15, 2002, in the presence of Major Turvin and Colonel Keefer.

  F. In fact, Pereguoy's initial reaction to his new, increased responsibilities was to inquire about the possibility of receiving a promotion and pay raise. (p. 7)

This was sarcasm on my part.

  G. Pereguoy did not object to his new assignment and failed to take advantage of several opportunities to raise any concern he may have had. (p.7)

On January 16, 2002, I talked to Warden Harbinger in the presence of Major Turvin about my new assignment. I explained to Warden Hardinger that I did not want the transfer and asked him if there was anything we could work. I asked him if this was a position that a Lieutenant could do and Warden Hardinger stated that it was a newly created position

8

for a Captain only. Warden Hardinger told me to think of a alternative schedule and present it to him. The following day I proposed two schedules to him. One was to wait until June to implement this schedule and the other was to work 4 days Friday, Saturday, Sunday and Monday from 2:00 p.m. to 12:00 a.m. Warden Hardinger said no to both options.

        H.   On a least one occasion, the Sheriff announced, in front of Pereguoy and several other officers, that he was "available" to discuss any of Pereguoy's concerns about his responsibilities. (p. 7)

On one of my last days in my position as Captain of Special Operations, Sheriff Tregoning walked into the office area and asked me who I was rooting for in the Super Bowl. I stated to him that I didn't care who won, I had more important things to think about like, what am I going to do. Sheriff Tregoning turned around and walked out of the office area and yelled "I'm available". I yelled to him "I'm available too". This conversation occurred in the presence of Lt. Sal Brown and Sgt. Royster.

        I.   Likewise, on January 31, 2002, the Warden offered to meet with Pereguoy, but Pereguoy never scheduled a meeting or called the Warden. (p. 7)

At the morning briefing on January 31, 2002, I asked the Warden if we could get together and go over what my new specific duties would be. He stated yes he would get with me later. Two different times during the day I saw the Warden but he never said anything to me. He never got with me about my new duties. Major Turvin was present when I asked the Warden if we could get together to discuss my new duties.

        J.   Instead, Pereguoy worked one last day, took several days lease, and resigned without warning. (p. 7)

I worked one day and requested leave, which was approved by the Warden.

K. In truth, Pereguoy was upset with his new assignment because it apparently conflicted with his personal plans. (p.7)

My personal plans have been affected more by resigning than if I had continued to work, therefore, I was upset because of becoming a target for Warden Harding, Colonel Keefer and Sheriff Tregoning.

L. The proposal was apparently "non-negotiable" from Pereguoy's view insofar as he never proposed any alternative schedule. (p.7)

I proposed a postponement of the move until June as well as the 4-day schedule to Warden Hardinger.

M. However, because of operational needs, including the need for a "Monday through Friday" evening Shift Commander, Pereguoy's proposal was turned down. (p. 7)

If there was such a need for this position, why has it never been filled even though Steve Reynolds, who was working in a civilian position, was promoted to Captain one week after I resigned? The need for this position never existed.

N. He also acknowledges that his new assignment did not prevent him from pursuing his own educational plans. (p. 8)

I have had to quit school because of loss of money and income.

O. Apart from the fact that his statement is misleading insofar as Pereguoy was provided new quarters... this is not an adverse employment action…" (p. 8)

The area I shared with Lt. Brown was designed as a file room with a 3" sewer pipe

running through the area.

    P. At any rate, Pereguoy was not even left without an office. (p. 9)

After being told to "go find a place" by Warden Hardinger, I could have ordered someone of lower rank out of their office, but I choose not to do that. The individual I could have ordered out of their office was an African-American.

    Q. Yet, Pereguoy never spoke to Colonel Keefer or the Sheriff about an office. (p. 9)

I spoke to Sheriff Tregoning about not having an office. Sheriff Tregoning walked away from me and stated while patting his neck, "don't hurry back".

    R. And he admits the Warden was willing to provide him with an office by relocating a subordinate officer. (p. 9)

The subordinate officer was Sgt. Royster, who is African-American.

    S. For instance, during his deposition, Pereguoy admitted that he had been (1) reassigned to work as Shift Commander of the detention center, (2) that his duties and and responsibilities would be similar to the Assistant Warden (Major Turvin), and (3) that he would continue to conduct internal affairs investigations, and for the time being (4) that he would continue to conduct "diversity" training. (p. 10)

Major Turvin had discussed with me in the fall of 2002, after being moved out of his office, that he was told by his superiors that his move to his present duties could be viewed as a demotion, even though it was not a loss of money. Doing the exact duties as Major Turvin was likewise, a demotion for me.

    T. Here, Perguoy cannot show that a job of equal or increased responsibility constitutes an adverse employment action. (p. 10)

As Captain in Special Operations, I was directly supervising 25-30 employees. In the new assignment, I was not directly supervising anyone, I just had higher rank than them.

U.  The fact that Pereguoy quit before he actually assumed his new duties belies his highly strained allegation that he was constructively discharged. (p. 11)

I started my new job on February 1, 2002, but did not have any specified duties because no one informed me of what I was supposed to do on a daily basis even though I asked the Warden earlier what were my specific duties. The Lieutenant on shift was in charge of operating the detention center according to Warden Hardinger and he never met with me to tell me what I was expected to do on a day-to-day basis.

V.  Given that Pereguoy's new assignment resulted in no change in pay, rank, job status, job title, or benefits, no finder would conclude that his working conditions were suddenly made intolerable. (p. 12)

My job status changed on February 1, 2002 to a position with less responsibilities than previously. In essence, I was still a Captain, but in rank only, not in responsibility or a position of status within the department.

W.  For instance, the Warden had received two reports regarding Pereguoy's apparent lack of diligence in supervising the collection and deposit of various inmate fees. (p. 14)

I was never informed of any reports written about my poor work performance in 20-plus years. I have no knowledge of any concerns regarding my competence.

X.  Colonel Robert Keefer, the Sheriff's Chief Deputy, was also concerned about Pereguoy's competence and attitude. (p. 15)

Colonel Keefer never mentioned anything to me regarding my competence or attitude in

the time he was in the Chief Deputy position. I was never counseled for my attitude or competency in 20-plus years.

      Y.   On two occasions Colonel Keefer had to order Pereguoy to 1) complete a written directive in a timely manner and 2) wear a pager while on duty. (p.15)

Colonel Keefer gave me a time period to complete a Policy and Procedures of Rules of Conduct for the Detention Center, which I completed on time. After turning that Policy and Procedure into Colonel Keefer he ordered me to revise another Policy and Procedure on Employee Disciplinary Action. I completed that Policy and Procedure on time as well, however, he did not like what I had done and he told me to redo it. Again, I redid the Policy and Procedure and turned it into him, as ordered. Colonel Keefer ordered me to do Policy and Procedure because the Warden had taken that responsibility away from he shortly after he became the Warden and stated that he would be responsible for drafting all Policy and Procedures. However, the Warden did not update or complete new policy and procedures in a timely fashion. Years passed and Colonel Keefer got upset when the Detention Center did not have updated policy and procedures, and therefore, delegated the task out to me. I have no other knowledge of any written directive that Colonel Keefer ordered me to complete and I failed to do so. Colonel Keefer did order me to wear a pager on duty. I had been issued a pager and Warden Hardinger removed me from the administrative callback list, during off duty hours, in the spring of 2001. I still wore a pager even though I was never paged or on-call until sometime in the summer of 2001. Cpl Shanelle Acree entered Major Turvin's office and I was sitting there talking with him. Cpl Acree was in charge of the INS prisoners that Sheriff Tregoning was housing. Cpl. Acree stated to Major Turvin that she had gone to the Warden on a couple of occasions and requested a pager because the detention center shift

Supervisor had tried to contact her, on numerous occasions, when she is off duty to ask questions about INS prisoners and they were unable to reach her. Cpl. Acree stated that she had not yet received a pager and was there anything he could do? I told her she could borrow my pager because I was not on call any longer and I didn't need it. A few days later Colonel Keefer saw me and asked where was my pager and I told him I didn't need one because I was not on call anymore. Colonel Keefer ordered me to get a pager. I immediately contacted Cpl. Acree and told her I needed my pager back, per Colonel Keefer.

   7. Colonel Keefer was one of my superiors and second in command in the Sheriff's Department for Carroll County.

I HEREBY DECLARE OR AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT BASED UPON MY PERSONAL KNOWLEDGE.

              /s/
              MARK L. PEREGOY

1001.RRH

Case 1:02-cv-04165-MJG     Document 17     Filed 04/23/2003     Page 15 of 15